In re The CROUSE GROUP, INC., Related Cases: Aronimink Corporation, Crouse Combustion Systems, Crouse Company, Inc., Crouse-Mitchell Fabricating Company, Inc., Crouse Recovery of Delaware Inc., Crouse of New Jersey, Inc., Y–E–P Industries, Inc., Debtors.

Bankruptcy Nos. 87–00576S to 87–00583S.

United States Bankruptcy Court, E.D. Pennsylvania.

March 16, 1987.

Peter Platten, Limerick, Pa., Alexander N. Rubin, Jr., Robert Lapowsky, Philadelphia, Pa., for debtors.

Baldo M. Carnecchia, Jr., Philadelphia, Pa., for Wilmington Trust.

Richard E. Fehling, Reading, Pa., for Hamilton Bank.

Jestyn Payne, Wyomissing, Pa., for Boyertown Nat'l Bank.

William A. Harvey, Rona J. Rosen, Philadelphia, Pa., for GECC.

Morton Newman, Philadelphia, Pa., for Continental Bank.

Marvin Krasny, Robert Levin, Philadelphia, Pa., for Creditors' Committee.

Peter S. Clark, Marjorie O. Rendell, Philadelphia, Pa., for Meridian Bank.

Grant McCabe, Philadelphia, Pa., for The Federal Ins. Co.

James M. Matour, Philadelphia, Pa., for Matabassset Sewer Auth.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

At issue in these Motions by four (4) related Debtors-in-Possession who have recently filed, with several other related entities, jointly-administered Chapter 11 bankruptcy Petitions, is whether we should grant contested Motions seeking approval of certain Stipulations by which the Debt-

ors propose to obtain credit for the purpose of meeting direct job costs in connection with certain construction projects through loans, pursuant to 11 U.S.C. § 364(c), from the bonding company on those projects. We hold that, in order to obtain our approval of these Stipulations, the Debtors must prove that (1) They cannot obtain credit unencumbered by super-priority status; (2) The credit transactions are necessary to preserve assets of their respective estates; and (3) The terms of the credit agreements are fair, reasonable, and adequate. Finding that the Debtors failed to prove any of the foregoing elements, we are constrained to deny the Debtors' Motions, although we will allow the present Stipulations to remain in effect through March 23, 1987, with certain limitations, in order that the Debtors can attempt to make alternative arrangements for financing.

At the outset, we must observe that the record is less complete than we would like it. For instance, we do not have, in the record, any copies of the bonding agreements between the Debtors and the proposed lender through consideration of which we could have determined, with precision, the rights of the proposed lender were the Stipulations not effected. Nor do we have any evidence of the extent, nature, and priority of any security interests of any of the creditors, including a creditor which has pressed an Objection, Continental Bank. However, the lack of clarity of the record on these points works to the disadvantage of the party with the burden of proof on the issue in question. While we recognize that the emergent nature of the circumstances reduced the parties' time to prepare a full record, we must also observe that the continuing notice of these proceedings has provided the parties with what we believe has been a full opportunity to make the necessary record. The parties have had two (2) chances to present testimony in a period of time of two (2) weeks. Moreover, in the case of the Debtors, the second opportunity was subsequent to our warnings at the close of first hearing that we perceived shortfalls in their initial presentation. Their failure to make a record which satisfies their rather substantial burdens on their second attempt leads us to conclude that the evidence necessary to meet their burdens is simply absent.

The Moving Parties herein are The Crouse Group, Inc. (hereinafter referred to as "the Parent"), Crouse Combustion Systems, Inc., Crouse Company, Inc. and Crouse of New Jersey, Inc. (hereinafter collectively referred to as "Crouse Companies"). The Crouse Companies are Debtors-in-Possession who filed Petitions for relief under Chapter 11 of the Bankruptcy Code on February 4, 1987, along with several other Crouse Companies identified in the case caption. Crouse Combustion Systems, Inc., Crouse Company, Inc. and Crouse of New Jersey are wholly owned subsidiaries of the Parent and are each engaged in the construction business.

At the hearing on this matter on March 10, 1987, we granted the Motion of the Crouse Companies to incorporate the record of the initial hearing, held on February 25, 1987, to consider approval of a prior Motion for Post-Petition Financing, into the record of that hearing. Also, on March 10, 1987, this Court heard additional testimony from Joseph Smith, the Executive Vice-President and Vice-Chairman of Crouse Group, Inc., who had also testified at the hearing on February 25, 1987.

Mr. Smith testified that he was a certified public accountant and had been with the Crouse Companies for approximately eighteen (18) years. He identified and described various construction projects of the Crouse Companies which existed on the filing date. He testified that, based on his projections, excluding overhead and after payment of approximately $9,000,000.00 in pre-petition debt, the jobs would generate a gross profit of $2,000,000.00 to $3,000,-000.00 based upon gross revenues of approximately $58,000,000.00 over a three to four year period. While Mr. Smith testified that none of the subsidiaries had the funds on hand necessary to finance completion of any of the projects, he did, at the second hearing, concede that the Parent had substantial funds available, but that it was not believed that making advances or loans to the subsidiaries was "the best

utilization" of the Parent's funds due to the limited profit potential of the projects.

Mr. Smith testified that seven (7) of the projects, representing approximately ninty-three (93%) percent of the total, are bonded for performance and payment by Federal Insurance Company (hereinafter referred to as "Federal"), the proposed lender. He testified that since the filing, the Crouse Companies had been meeting with and negotiating with Federal concerning the completion of the jobs. According to Mr. Smith, Federal was advised immediately after the filing that the Crouse Companies would not support the bonded projects from general assets of the estate beyond payroll for the first week. Subsequently, the Crouse Companies did agree to fund payroll for the second week but, thereafter, refused to fund any other expenses of the bonded projects.

Based on the inability of the Crouse Companies to fund any further bonded project expenses, Stipulations were entered into between Federal and the Crouse Companies pursuant to which Federal was to loan to the Crouse Companies monies sufficient to meet payroll expenses for the week of February 25, 1987, in exchange for receipt of a "first position security interest" by Federal in the accounts receivable on the bonded projects. In the late afternoon of February 24, 1987, counsel for the Debtors proposed to file these Stipulations and have us approve them ex parte. We declined to do so, and required that notice be given to the largest creditors that a hearing would be held the next day before we would act. On February 25, 1987, numerous counsel appeared, including Counsel representing Continental Bank, apparently a secured creditor, and the Official Unsecured Creditors' Committee of the Parent. After a hearing to consider approval of the Stipulations, at which Mr. Smith was the only witness, on February 25, 1987, and over the objection of Continental Bank, we approved the Stipulations. However, at that time, we noted that the Creditors' Committee did not oppose the Stipulations, and we specifically advised the Debtors (1) That we considered its having met the burdens of proof imposed by 11 U.S.C. §§ 364(c), (d) doubtful; (2) That we were acting only because the sums to be advanced were modest; and (3) We did not anticipate approving the Stipulations for a longer period than the one week sought.

At the hearing on March 10, 1987, Mr. Smith testified that, on March 2, 1987, a meeting was held with Federal at which Federal expressed its belief that it could complete the bonded projects without the Crouse Companies. Per Mr. Smith, the Crouse Companies expressed to Federal their view that such a course of action would be much more expensive to Federal than it anticipated, based upon the unique engineering aspects of the jobs. After that exchange, Federal decided that further review was necessary and the Second Stipulations, presently before the Court for approval, were executed. These Stipulations proposed to extend the terms of the previous Stipulations through April 5, 1987.

Mr. Smith articulated that he had three (3) reasons for entering into the Second Stipulations. Primary was his concern that the general estate assets would not be utilized to support the projects. Second was his desire to minimize the escalation of any claims against the Crouse Companies by Federal. Such escalation would result to the extent the cost to complete the projects increased to the lack of Crouse participation and exceeded the sums remaining due from the owners. Third was his desire to maintain the potential that Federal, after further review, would agree that participation of the Crouse Companies, in some capacity, was in everyone's best interest. As to the third goal, Mr. Smith testified that, should Federal make such a determination, the services of the Crouse Companies would be available only under an arrangement which resulted in a profit to the Crouse Companies. Mr. Smith made clear that, during the period of the Second Stipulations, no profit would be realized. He also conceded that Federal had a very clear incentive for perpetuating the relationship with the Crouse Companies in any event, because it could use the period until April 5, 1987, to find replacements for the Crouse Companies on the projects, and

would be assured of a continuum of services from the Crouse Companies until the date when the Stipulations expired. Mr. Smith left us with the clear impression that it was quite likely that Federal would decide, on April 5, 1987, not to renew the Stipulations and undertake to replace the Crouse Companies at that time.

Mr. Smith further testified that the accounts receivable from the owners of the bonded projects were not subject to any existing liens and that, since the filing date, the Crouse Companies had not received payment from the owners on any of the bonded projects. He also stated that, if the Stipulations were not approved, the Crouse Companies would be forced to close down the construction projects. In his opinion, such terminations would significantly increase the cost of completion of the projects and Federal's claims against the estates of the Crouse Companies. Further, any possibility that funds would ever be collected by the Crouse Companies from the owners would be eliminated. However, it was quite clear that all of these consequences could occur as of April 5, 1987, in any event, if Federal decided not to enter into any further Stipulations.

Finally, Mr. Smith stated that he had made a request to Meridian Bank for an unsecured loan in exchange for only an administrative expense priority to that lender and had been turned down. While he further stated, in a generalized way, that, prior to the filing of the Bankruptcy Petition, he had requested additional credit from his existing lenders, he also testified that he had not made any requests for further credit from Continental Bank and he had not requested that Federal consider providing unsecured credit per 11 U.S.C. § 364(b). Although he did state that, based upon his years of experience as a certified public accountant and his dealings with banks as Vice-President of the Crouse Companies, unsecured credit with an administrative expense priority was and is unavailable to the Crouse Companies, the failure of the Debtors to explore specific alternatives renders this assessment one that we would not accept as established on its record. Mr. Smith was also asked about the impact of the Stipulations upon James G. Crouse, the Chief Executive Officer of the Debtors, who, although at that time on vacation and personally indebted to the Parent in the amount of approximately $1,500,000.00 on which debt he had not made payment since June, 1986, was receiving an annual salary of $175,000.00 and monthly rent payments of $6,600.00 monthly. Also, Mr. Smith testified that the Parent was owed about $4,000,000.00 by Diversified Energy Systems, Inc., and had received little repayment on this debt in the past year.

All of the interested parties, including Continental Bank, agreed that the Second Stipulations could be approved through March 10, 1987, the date of the second hearing, and we entered Orders on March 4, 1987, so providing. However, we stated at that time, and entered an Order on March 5, 1987, so providing, that any parties wishing to take a position on the extension beyond March 10, 1987, should make their position known to the Court and submit Briefs on or before March 9, 1987.

At the hearing on March 10, 1987, the parties contended that they had not received copies of this Order in timely fashion and therefore were unable to comply therewith. In any event, all that we received by April 10, 1987, was a brief set of written Objections to the Stipulations from Continental Bank and the Creditors' Committee.

After the hearing on March 10, 1987, per an oral Order of that date, reduced to writing on March 11, 1987, we extended the Stipulations through March 17, 1987, and directed any interested parties to submit Memoranda of Law on the issue of whether the Stipulations should be continued beyond March 17, 1987. We have received Memoranda from the Debtors and from the Creditors' Committee in timely fashion. On March 16, 1987, we had Continental Bank, which apparently overlooked that aspect of our Order of March 11, 1987, requesting that we be served with a copy "in chambers," deliver a copy of its Memorandum to us.

The possibly pertinent sections of the Bankruptcy Code are 11 U.S.C. §§ 364(c) and (d), which provide as follows:

(c) If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt—

(1) with priority over any and all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;

(2) secured by a lien on property of the estate that is not otherwise subject to a lien;

(3) secured by a junior lien on property of the estate that is subject to a lien.

(d)(1) The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of a debt secured by a senior or equal lien on property of the estate that is subject to a lien only if—

(A) the trustee is unable to obtain such credit otherwise; and

(B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

(2) In any hearing under this subsection, the trustee has the burden of proof on the issue of adequate protection.

■ We must concede, at the outset, some uncertainty as to whether § 364(d) applies here, because we are uncertain whether the accounts receivable on which Federal would obtain super-priority status are already subject to a lien. Mr. Smith testified that they were not. Continental Bank apparently initially thought that they were subject to some lien, because it quotes § 364(d) in its Objections to the Stipulations. However, in its Memorandum, Continental Bank excises any reference to § 364(d), and we observe that we have no documents or other evidence enlightening us as to the scope of any lien of Continental Bank or any other entity ex-tending to these accounts receivable. Although 11 U.S.C. § 364(d)(2) provides that the Debtors have the burden on the issue of adequate protection, § 364 is silent on the issue of which parties have the burden of proof on the issue of establishing that property is "subject to a lien." Logic dictates that, as in a cash collateral Motion per 11 U.S.C. § 363(c)(2), the entity asserting a lien should have the burden of proof on this issue, as it would be anticipated that this party would have the best access to proof on this issue. *Compare* 11 U.S.C. § 363(*o*)(2); and *In re Grant Broadcasting of Philadelphia, Inc.*, (First Opinion), 71 B.R. 376, 384–85 (Bankr.E.D.Pa., 1987). Since Continental Bank has not met its burden on this issue, we are forced to conclude that there is no evidence of prior liens on the accounts receivable, and we shall therefore consider these. Motions as motions pursuant to § 364(c). This eliminates the tricky burden which would otherwise be placed upon the Debtors to establish that the interests of any other creditors, including Continental Bank, are adequately protected. *See In re Moor*, 51 B.R. 640, 642–43 (Bankr.N.D.Miss.1985); and *In re Petersburg Hotel Associates, Ltd.*, 44 B.R. 944, 946 (Bankr.M.D.Fla.1984). *Cf. Grant Broadcasting, supra*, at 386–90.

■ However, we believe that the Debtors must nevertheless sustain the burden of establishing the following before we could approve the Stipulations in issue: (1) They are unable to obtain unsecured credit per 11 U.S.C. § 364(b), i.e., by allowing a lender only an administrative claim per 11 U.S.C. § 503(b)(1)(A); (2) The credit transaction is necessary to preserve the assets of the estate; and (3) The terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender.

There are few cases addressing the issue of the burdens which a debtor must meet to satisfy § 364(c), and those that do so speak in generalities. In *In Ellingsen MacLean Oil Co.*, 65 B.R. 358, 364–65 (W.D.Mich.1986), the Court indicates that the burdens of the Debtor are greater in a

presentation of a § 364(c) Motion than they would be in a request by the Court to approve an order settling a controversy, which the *Ellingsen* court suggests would be the standard in a request to approve credit extended per 11 U.S.C. § 364(b). In *In re Adamson Co.*, 29 B.R. 937, 940 (Bankr.E.D.Va.1983), the court holds that, in an expedited proceeding, "the granting of a § 364(c) priority should carry at least the same if not a heavier burden of proof than that of a petitioner asking for a temporary restraining order must bear."

We recognize, as we discussed at length in the Opinion approving a settlement agreement effected by the Debtors there with a particular creditor seeking relief from the Debtors, that, generally, a debtor-in-possession has significant latitude in making judgments about the operation of his business, and this principle carries over to assessment of settlement agreements made by debtors-in-possession. *In re Grant Broadcasting of Philadelphia, Inc.*, (Second Opinion), 71 B.R. 390, 395–96 (Bankr.E.D.Pa., 1987). This principle is the foundation of the Debtors' argument here, and they cite *In re Garland Corp.*, 6 B.R. 456 (1st Cir. Bankr.App.1980); and *In re Simasko Production Co.*, 47 B.R. 444 (D. Colo.1985), as cases purportedly applying these principles in the context of § 364(c) Motions.

However, although *Simasko* includes some rather strong language about the right of a debtor-in-possession to make ordinary business judgments, 47 B.R. at 449, these comments are made in the context of consideration of objections to whether a certain drilling program of the debtor was a good economic risk. The funding issue, concerning which there was no dispute that the debtor could not financially accomplish otherwise than with the finance arrangement in issue and pursuant to which the interests of the objecting creditor were found to be adequately protected, *id.* at 448–49, was purely secondary.

In *Garland,* the court accepted the bankruptcy court's findings that the debtor there urgently needed funds and could not

obtain the funds elsewhere. 6 B.R. at 461–62. A similar combination of clear findings on the necessity of the funds, an absence of alternatives, and a weighing of the wisdom of the funding agreements is included in other cases approving lending pursuant to 11 U.S.C. § 364(c). *See In re AAA Produce Co.*, 58 B.R. 430 (Bankr.E.D. Mo.1986); and *In re FCX, Inc.*, 54 B.R. 833 (Bankr.E.D.N.C.1985).

We therefore reiterate that a Motion pursuant to 11 U.S.C. § 364(c) can be approved only if the debtor meets its burden on each of the three (3) elements set forth at pages 397 and 397 *supra.* Putting aside the issue of whether the matter at issue is a "tailored emergency," *see Ellingsen, supra,* which is not as evident here as in some other matters which came before us and is definitely, as the *Adamson* court articulates, a reason for requiring a higher standard of proof from the moving party, we conclude that we must deny the instant Motions because the Debtors have fallen short of proving, to our satisfaction, any of the three (3) requisite elements.

■ First, we are not convinced that the Debtors have made the requisite exhaustive unsuccessful efforts to obtain credit on terms in accordance with § 364(b). Only one lending institution was approached. Mr. Smith did not totally convince us that the potential of receiving funds from the Parent had been exhausted, and he admitted that Federal had never even been asked whether it would agree to extend credit on other than the proposed less-than-desirable terms. The Debtors never approached Continental Bank or Hamilton Bank, which is apparently also a large creditor, for funding. Given the relative ease of establishing this element and our expression that it had not been satisfied at the February 25, 1987, hearing, we can make no other observation except that, from the feeble showing made on this issue at the March 10, 1987, hearing, the Debtors are incapable of establishing that they are "unable to obtain" credit under the terms of § 364(b).

■ Secondly, we are not convinced that these Stipulations will do very much in the

way of preserving the assets of the respective Debtors' estates. Mr. Smith conceded that the present arrangement cannot profit the Crouse Companies except to keep alive a faint hope that Fidelity will continue to fund their efforts on the projects through completion and that it seems quite likely that Federal will dash this hope by replacing the Course Companies with other less financially-troubled contractors as soon as it is able to do so. In any event, we can see little to be gained in moving the day of reckoning to April 5, 1987, or any further date to which Federal and the Debtors may, at that time, ask us to extend it, from the date we establish here, March 23, 1987. We quite agree with the observation of the Creditors' Committee that all that these Stipulations practically accomplish is giving Federal more time to work replacement contracting firms into place and according Federal a priority status among creditors. We believe that, if it is really important for Federal to retain the Crouse Companies on the projects, they should, in our judgment, forego this favored treatment. Similarly, we believe that either continuing on these jobs is important enough to the Parent that it should utilize its own resources to fund them or they are not important enough to retain, and hence are not necessary to the preservation of the assets of the Debtors' estates.

■ In light of the foregoing, we also cannot conclude that the terms of the Stipulations are fair, reasonable, and adequate under these circumstances. We are allowing the Stipulations to remain in effect through one more pay-period and to finish the workweek, in order to give the Debtors the opportunity to negotiate better terms with Federal or make other financial arrangements. We are not foreclosing the approval of agreements with Federal under § 364(b), wherein we would apply, with the *Ellingsen* court, a standard similar to that in considering debtor-sanctioned approval of controversies, as we did in our Second Opinion in *Grant Broadcasting*. Nor are we foreclosing reconsideration of our decision here if presented with a record which satisfies each of the three (3) criteria set forth herein. The latter is, however, not meant to encourage a reprise of the previous two (2) hearings, which, after extended consideration, we believe manifested a clear failure of the Debtors to meet their necessary burdens. Further, we are immediately directing that any payments to Mr. Crouse for any reason cease, as we do not consider it fair or reasonable that such a substantial debtor and insider should receive one penny at the expense of other creditors. In sum, we believe that, given the circumstances of the Debtors, they should be able to negotiate better credit terms, if they really consider it worth their while to preserve these projects. Until they do, or do a better job of convincing us that they have done so than they have accomplished in their previous two (2) attempts, we are unwilling to find that the terms of the Stipulations presented to us for approval in the Motions before us are either fair, or reasonable, or adequate to the Debtors or to other creditors. This is especially true upon our consideration of the relationship of Federal and the Debtors and our belief that it is quite possible that Federal would extend credit per 11 U.S.C. § 364(b) without insisting on any super-priority status.

An Order consistent with this Opinion shall be entered this day.