**In re The CROUSE GROUP, INC., Related Cases: Aronimink Corporation, Crouse Combustion Systems, Crouse Company, Inc., Crouse-Mitchell Fabricating Company, Inc., Crouse Recovery of Delaware Inc., Crouse of New Jersey, Inc., Y–E–P Industries, Inc., Debtors.**

**Bankruptcy Nos. 87–00576S to 87–00583S.**

United States Bankruptcy Court,
E.D. Pennsylvania.

June 26, 1987.

See, also, Bkrtcy., 75 B.R. 560.

Alexander N. Rubin, Jr., Robert Lapowsky, Philadelphia, Pa., Peter Platten, Limerick, Pa., for debtors.

Baldo M. Carnecchia, Jr., Philadelphia, Pa., for Wilmington Trust.

Richard E. Fehling, Reading, Pa., for Hamilton Bank.

Jestyn Payne, Wyomissing, Pa., for Boyertown Nat'l. Bank.

William A. Harvey, Rona J. Rosen, Philadelphia, Pa., for GECC.

James M. Matour, Philadelphia, Pa., for Matabasset Sewer Auth.

Morton Newman, Philadelphia, Pa., for Continental Bank.

Robert Levin, Philadelphia, Pa., for Creditors' Committee.

Peter S. Clark, Marjorie O. Rendell, Philadelphia, Pa., for Meridian Bank.

Grant McCabe, Philadelphia, Pa., for The Federal Ins. Co.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

Before us is a Motion requesting authorization from this Court to resume the payment of salary and rent for the realty in which the parent-Debtor's principal place of business is located to the Chairman and Chief Executive Officer and the primary shareholder of the parent-Debtor, James G. Crouse. We shall award Mr. Crouse the rent payments sought, award compensation of $100,000.00, and reasonable expenses, retroactive to March 16, 1987, when all payments to him were terminated per our Order, but we shall suspend immediate payment of the sums for salary, allowing such sums to be credited to him only in the form of setoffs against the debt of $1,500,-000.00 which he allegedly owes personally to the Debtors, at least until the Court can make some preliminary determination of the legitimacy of this debt.

The seed for the present Motion was planted in our Opinion of March 16, 1987, in which we denied the Motion of the Debtors, the parent of several companies mostly involved in the construction industry and several of the parent's subsidiaries, which filed Chapter 11 cases on February 4, 1987, for permission to enter into a post-petition financing contract with a bonding company on many of its construction contracts, Federal Insurance Company (hereinafter referred to as "Federal").

In the course of this Opinion, reported at 71 B.R. 544 (Bankr.E.D.Pa.1987), we observed that the Debtors' Chief Financial Officer, its Executive Vice-President and Vice-Chairman, Joseph E. Smith, had testified, on March 10, 1987, that

> James G. Crouse, the Chief Executive Officer of the Debtors, ... although at that time on vacation and personally indebted to the Parent [Debtor] in the amount of approximately $1,500,000.00 on which debt he had not made payment since June, 1986, was receiving an annual salary of $175,000.00 and monthly rent payments of $6,600.00.... *Id.* at 548.

Therefore, in addition to denying the Motion, we specifically ordered that "no funds are to be paid to James G. Crouse for any purpose whatsoever from the date of this Order forward."

On April 3, 1987, as per the words of the Debtors in the instant Motion, "[r]ather than file an appeal of the decision of this Court ... the Debtors filed a Motion to reinstate the compensation of Mr. Crouse

in order to present a complete record."[1] Memorandum in support of Motion of Debtors to Compensate James G. Crouse, Chairman and Chief Executive Officer [of Debtors], at 3. The Debtors further averred, in that Motion, that the Court's action effects "a reversal of the customary practice ... [t]hat, ... pursuant to Local Rule 4002.1, notice of an officer's compensation is given to the creditors and objections ... may be filed ... and after hearing, the Court may adjust the compensation...." *Id.* at 2.[2]

On April 10, 1987, and April 24, 1987, respectively, the official Committee of Unsecured Creditors and Continental Bank, a creditor, filed Objections to the granting of the instant Motion. On April 28, 1987, we conducted a hearing on the Motion at which Mr. Smith and Mr. Crouse, the latter being independently represented by his own counsel, testified. At the close of the hearing, we ordered the parties to simultaneously file Briefs in support of their respective positions on or before May 8, 1987, which date was extended by later developments described hereinafter.

Mr. Crouse testified concerning the expansion of his companies from an original initial investment of but $15,000.00 in 1954 to a net worth of over $14,000,000.00 as of June 30, 1986. Unfortunately, due to extensive losses attributed by both witnesses solely to a contract to construct a sewerage disposal plant for the Delaware Solid Waste Authority, at Pigeon Point, Delaware, the companies were reduced to a negative net worth as of the date of the filing of the bankruptcy petitions. Mr. Smith testified that Mr. Crouse was active in negotiating various aspects of many of the Debtor's current projects, and was "the only one" who could continue to do so effectively. Mr. Crouse attributed the two vacations taken by him in the two months between the filing and the hearing, one in Grand Cayman Island and one in Florida, to a prescription from his doctor "for nerves and sleeping."

There was testimony that some of the gratuities added to Mr. Crouse's pre-petition salary had been eliminated. A private airplane and a yacht were sold in February, 1987. A property in Florida was sold in March, 1987. However, the Debtors still owned a beach-house property in Beach Haven, New Jersey, and supplied Mr. Crouse with two motor vehicles, one a "new" two-seater Mercedes 450SL and the other a "one or two-year-old" Jaguar sedan. The rationale for supplying two automobiles was that "only one has a telephone."

A particular source of inquiry was the $1,500,000.00 debt owed to the Debtors by Mr. Crouse. Apparently, this sum had been borrowed by Mr. Crouse, on an interest-free basis, for utilization in various unspecified personal business ventures over approximately the last ten years.[3] It was explained that, before the end of each of the parent-Debtor's fiscal years, Mr. Crouse took out a personal loan, paid the loan off, and then re-borrowed from the parent-Debtor and paid off the personal loan. The reason for this, per Mr. Smith, was because the Internal Revenue Service "frowns on" a corporation's showing out-

---

1. We note that one other likely reason for the Debtors' not filing an appeal was the agreement of Federal to continue funding the Debtors' operations on the construction contracts on an interim basis, including an allowance to the Debtors $100,000.00 weekly for overhead in excess of costs, without the onus of the super-priority which Federal was to receive under the proposed financing arrangement, thus rendering accurate our prediction that the Debtor could negotiate better terms with Federal than those contained in the post-petition financing agreement, which was one of the primary reasons that we refused to approve the proposed agreement. *See* 71 B.R. at 550–51.

2. We note that such a notice must be mailed within forty-five (45) days from the filing of the petition, per Local Bankruptcy Rule 4002.1(e). Since the petition in this case was filed on February 4, 1987, we note that the notice was due to be filed on or before March 21, 1987, just five (5) days before we filed our Opinion of March 16, 1987, and that no notice had been filed as of that date.

3. During the hearing, at different times, Mr. Smith stated that this sum was accumulated over five years and over ten years. Mr. Crouse set the period at ten years at one time and twenty years at another. We state "approximately ten years" because this is the median of the time-periods recited.

standing interest-free loans to insiders on its books at the end of the fiscal year. Despite repeated and specific questioning, Mr. Crouse was unable to identify *any* specific purposes for which these funds had been utilized. Although Mr. Crouse himself was very positive that, since the debt appeared on the Debtors' books, this entry was accurate, his counsel rather ingeniously suggested that this debt was offset by a personal guarantee made by Mr. Crouse on or about December 31, 1986, in the amount of about $4,400,000.00, in connection with the ill-fated Pigeon Point project.

The office building in which the Debtor conducts its primary place of business, located at 836 Lewis Road, Royersford, Pennsylvania, proximate to a golf course operated by one of the subsidiary-Debtors, was said to contain 35,000 square feet, 20,000 of which were used by the Debtor, and which was rented by Mr. Crouse to the Debtor for $6,875.00 per month. The mortgage payment of Mr. Crouse was said to be $4,742.00 per month. It was unclear whether another entity occupied the residual 15,000 square feet of the building. The Debtor has, to date, made no motion to assume or reject the lease pursuant to 11 U.S.C. § 365(d)(4), having obtained permission from the Court, per Order of April 9, 1987, to extend the 60–day post-filing period for doing so for an additional ninety days, or until early July, 1987.[4]

Although the Creditors' Committee filed a Brief opposing the Motion on May 8, 1987, counsel for both the Debtor and Mr. Crouse requested and were granted an extension until May 15, 1987, to file their Briefs. On the subject of compensation, all parties cited to the recent decisions of other judges of this Court in *In re Athos Steel & Aluminum, Inc.*, 69 B.R. 515, 520–22 (Bankr.E.D.Pa.1987) (per FOX, J.);[5] and *In re Zerodec Mega Corp.*, 39 B.R. 932 (Bankr.E.D.Pa.1984) (per TWARDOWSKI, CH. J.). However, neither of these decisions addressed the issue of the impact of

an alleged debt of the party seeking compensation to the Debtor upon such a request. On this latter issue, counsel for both the Debtor and Mr. Crouse cited to *In re Swann Oil, Inc.*, Bankr. No. 84–01686T, a case before Judge Twardowski of which it was said that "the chief executive officer of the debtor is receiving substantial compensation from the debtor notwithstanding that the books and records of that debtor reflect that the officer is indebted to the debtor to the extent of some $4,000,-000.00." Memorandum in Support of Motion of Debtors to Compensate James G. Crouse, Chairman and Chief Executive Officer [by counsel for Crouse], at 6.

After attempting, with only limited success, to obtain further specifics regarding the purported precedent in favor of Mr. Crouse in the *Swann Oil* case, we requested his counsel to supply us with the *Swann Oil* Order granting the compensation in question. On May 27, 1987, we received not the Order, but a lengthy letter and many pages of documents relevant to the compensation of Dr. Leonard A. Swann in that case from Mr. Crouse's counsel. We invited a comment from the Creditors' Committee and received its response in the form of a letter dated June 3, 1987.

Our conclusion is that, whatever may have occurred in the *Swann Oil* case, it is of absolutely no precedential value here. Despite requesting same, we have yet to see the Order granting compensation to Dr. Swann in that case. We have considerable doubt that the purported debt of Dr. Swann was incurred by straightforward borrowing, as opposed to some sort of book entry, unlike the debt of Mr. Crouse to the Debtors here. It also appears that Dr. Swann may have effectively received a significant decrease in compensation from over $1,000,000.00 annually to about $175,-000.00 annually after the bankruptcy filing. We also doubt whether the issue of Dr. Swann's debt was raised as an issue in opposition to his compensation request, and

---

4. The Debtor and Mr. Crouse both argued that 11 U.S.C. § 365(d)(3) required the Debtor to pay the rent in the interim until the lease is assumed or rejected. *But see* pages 558–59 *supra*.

5. We note that Judge Fox has also published a subsequent decision in this area, *In re State Optical Co.*, 70 B.R. 82 (Bankr.E.D.Pa.1987).

we are quite certain that Chief Judge Twardowski never consciously rendered a decision on that issue.

We therefore conclude that none of the decisions of this Court address the issue of the impact of the debt of Mr. Crouse to the Debtors upon his request for compensation from them. This Court has only had occasion to render one decision on the issue of compensation. On March 13, 1987, we granted in part a request for compensation by Milton Grant, founder, President, and Chief Executive Officer of Grant Broadcasting System, Inc., awarding him a salary of $125,000.00 annually in response to his request that he be authorized to receive $270,000.00 annually. This award resulted after very vigorous opposition from two large groups of creditor interests, which challenged the manner in which Mr. Grant had financed the debtor corporations; several transfers by the Debtors on the eve of bankruptcy, including compensation to Mr. Grant for expenses; and the general competency of his management of the Debtors. However, we note the following regarding Mr. Grant: (1) He had experienced almost phenomenal, unprecedented success in the independent television industry less than two years prior to the bankruptcy filing. *See In re Grant Broadcasting of Philadelphia, Inc.*, 71 B.R. 376, 379–80 (see Findings of Fact, ¶s 5–7) (Bankr.E.D.Pa.1987), *aff'd*, 75 B.R. 819 (E.D.Pa.1987); (2) Rather than owing money to the entities he had established, Mr. Grant had, in the past two years, invested $2,600,000.00 of his personal funds into the Debtors. *Id.* at 380 (Finding of Fact, ¶ 9); (3) The recent difficulties of the Grant entities leading to the bankruptcy filings were attributable to economic conditions largely beyond the control of Mr. Grant. *Id.* at 381 (Findings of Fact, ¶s 25–27); and (4) Outstanding ability of not only Mr. Grant, but his entire management team, had been amply demonstrated. *Id.* at 382 (Findings of Fact, ¶ 32).

Our Order in *Grant Broadcasting*, not accompanied by an Opinion, was appealed only by the opposing creditor interests.

The contentions of the Debtors and Mr. Crouse that creditor opposition has been excessive pales dramatically in comparison with that in *Grant Broadcasting* on both the compensation issue and generally. Also, we must observe that, in terms of our perception of relative energy, competency, candor, personal significance to the Debtors, and course of financial dealings with Debtors of which he is the principal, the status of Mr. Crouse can be distinguished from that of Mr. Grant to the disadvantage of Mr. Crouse.

We have located no direct precedent in any decision elsewhere as to what impact the debt of Mr. Crouse to the Debtors should have upon his request for compensation. Our *Grant Broadcasting* decision does establish that all potentially-relevant factors concerning the operations of the Debtors must be considered in ruling on a compensation request. Our concern that Mr. Grant's $270,000.00 annual compensation was too generous in light of the Debtors' financial difficulties and our concern that several preferential transfers were made by the Debtors on the eve of bankruptcy—one of which was compensation for expenses to Mr. Grant—definitely influenced our decision.

■ It is clearly established by *Athos Steel, supra,* 69 B.R. at 520–21; and *Zerodec, supra,* 39 B.R. at 933–35, that, although the issue of compensation of a debtor's employees is subject to court scrutiny, per 11 U.S.C. § 327(a), an "insider" is not disqualified, *ipso facto*, by reason of his interest, from receiving compensation. However, the Court will "subject to greater scrutiny" such transactions and will reverse the usual imposition of the burden of proof and place it squarely upon the insider in such a circumstance. 39 B.R. at 935. *Accord, In re Hooper, Goode Realty,* 60 B.R. 328, 331–32 (Bankr.S.D.Cal.1986).

■ One of the principal authorities cited by *Zerodec* was the Supreme Court's decision in *Wolf v. Weinstein,* 372 U.S. 633, 83 S.Ct. 969, 10 L.Ed.2d 33 (1963). There, Justice Brennan, writing for the Court, established several principles which we believe are pertinent here. First, the Court

held that corporate officers and directors are, during the bankruptcy process, considered to be fiduciaries to the corporate debtor-in-possession (hereinafter referred to as "DIP"). 372 U.S. at 642–45, 83 S.Ct. at 975–77. Secondly, the Court held that, so long as the Debtor remains in possession, it is clear that

> that *corporation* bears essentially the same fiduciary relationship to the creditors as does the trustee for the Debtor out of possession. *Id.* at 649, 83 S.Ct. at 979.

Cases decided under the Code, in addition to, by implication, *Zerodec,* and *Athos Steel,* and *State Optical, supra,* following it, have expressly reiterated the principle that the employee of a DIP is a fiduciary vis-a-vis not only the DIP, but also its creditors. *See In re Baldwin-United Corp.,* 43 B.R. 443, 459–60 n. 22 (S.D.Ohio 1984); and *In re Club Development & Management Corp.,* 27 B.R. 610, 612 (9th Cir.Bankr.App.1982).

In *Baldwin-United, supra,* in considering albeit the distinct issue of compensation to corporate directors for legal expenses incurred in defending state court suits against them, the Court, relevant hereto, balances the tenets of corporate law which would authorize such reimbursement against the federal bankruptcy policy "of equality of distribution of assets among similarly situated creditors" and holds that the federal bankruptcy policy "would outweigh the policies supporting indemnification of corporate directors once a corporation has become a Chapter 11 debtor." 43 B.R. at 443.

■ We believe that the application of these principles to the instant case requires us to conclude that, whatever payments might otherwise be due to Mr. Crouse from the Debtors, most of these payments should be suspended in order that the Debtors can obtain an offset of the sums due to Mr. Crouse against the substantial debts that Mr. Crouse appears to owe to the Debtors. In this way, we believe that we are treating Mr. Crouse consistently with the Code policy that there must be equal distribution of assets among creditors and

that Mr. Crouse, as a fiduciary to the creditors as well as the Debtors, will not receive any sort of priority over other creditors.

We do acknowledge Mr. Crouse's status as an administrative claimant, even as to his salary claim. *See* 11 U.S.C. § 503(b)(1)(A). *Cf. Club Development, supra,* 27 B.R. at 612–13; and *In re Schatz Federal Bearings Co.,* 17 B.R. 780, 783–84 (Bankr.S.D.N.Y.1982). However, this factor does not, in itself, entitle him to immediate payment. *See In re Grant Broadcasting of Philadelphia, Inc. (Fourth Opinion),* 71 B.R. 891, 899–900 (Bankr.E.D.Pa.1987).

Mr. Crouse's request for immediate rental payment for the realty occupied by the Debtors arguably stands on a stronger footing, because the 1984 Bankruptcy Code amendments, and 11 U.S.C. §§ 365(d)(3) and (d)(4) in particular, suggest that landlords are entitled to special protection, in the form of "timely" performance of the debtor's obligations under a lease "until such lease is assumed or rejected, notwithstanding section 503(b)(1) of this title." 11 U.S.C. § 365(d)(3); *see Grant Broadcasting, supra,* 71 B.R. at 898–99.

We are compelled to make note of several unique aspects of the particular landlord-tenant relationship between the Debtors and Mr. Crouse here. First, Mr. Crouse has been ordered, per a Motion to which he did not object, to grant the Debtors an additional ninety (90) days to decide whether they wished to accept or reject the lease. Secondly, applying the most rudimentary of equitable principles, we doubt that Mr. Crouse could convince any court, and certainly he could not convince us, that, because we *ordered* the Debtors not to pay him rent, on the basis of countervailing equitable considerations, the payment of rent, per § 365(d)(3), was improperly withheld, and that, because of non-payment, the Debtors could be deemed to have rejected the lease.

Finally, our approach is not to deny Mr. Crouse either his rent or a reasonable salary, or reasonable expenses. The rent payments and the expenses shall resume, but the salary payments shall be suspended

and offset against his potential liability to the Debtors. Hence, we perceive no issue of non-payment of rent, per 11 U.S.C. § 365(d)(3), to be present.

We observe that the Creditors' Committee has obtained permission to pursue Mr. Crouse for the $1,500,000.00 and, on June 23, 1987, initiated such a proceeding at Adversary No. 87–0588S. We note that a trial is scheduled on August 11, 1987, and it therefore appears that the issue of his liability to the Debtors will be brought to a head shortly. If these proceedings are voluntarily dismissed, or if Mr. Crouse prevails, or if they are unreasonably delayed by the Creditors' Committee, we invite Motions by Mr. Crouse to pay him both his reasonable salary, as well as his reasonable expenses and the rent, immediately, retroactive to March 16, 1987, and on a monthly basis thereafter.

Regarding the reasonable salary and rent payable, we shall reduce the salary request to $100,000.00 annually and the expenses, the latter of which we shall allow for immediate payment, to the upkeep of one motor vehicle and any other reasonable expenses, not in excess of those reimbursed pre-petition. We note that Mr. Crouse, despite the multiple representation of his interests, has presented no evidence of the market value of comparable employees, as did the officers seeking compensation in *State Optical*, 70 B.R. at 84 (Chief Executive of retail company allowed $88,400.00 annually); and *Athos Steel*, 69 B.R. at 521–22 (Chief Executive of steel company allowed $70,000.00 annually), and whose requests, despite this evidence, were reduced. Therefore, as in *Grant Broadcasting*, our award must be simply what appears subjectively reasonable to us. *Compare Zerodec*, 39 B.R. at 935 (Chief Executive Officer and founder of corporation of unspecified business awarded $41,600.00 annually, where no evidence of value in open market presented). We consider that Mr. Crouse was the prime mover in building the Debtors to an impressive status with little capital. We also consider that we are deferring payment of these sums. On the other hand, we cannot excuse Mr. Crouse from responsibility for the Debtor's undertaking the fatal Pigeon Point project and we must reiterate that Mr. Crouse was less impressive than Mr. Grant, whom we awarded $125,000.00 annually.

Finally, we note that the reasonability of the amount of rent charged, $6,875.00 monthly, has not been specifically disputed by any of the objectors or any evidence. We note that allowing Mr. Crouse to receive the rents will, in itself, bring him in a net income of this payment less the mortgage, or $2,133.00 monthly and $25,596.00 annually. We do not consider Mr. Crouse to be pauperized by receipt of this sum, plus his expenses, which is all that we are allowing him to receive immediately.

An Order consistent with the reasoning expressed in this Opinion shall issue.

## ORDER

AND NOW, this 26th day of June, 1987, after hearing testimony on April 28, 1987, on the MOTION OF DEBTORS TO COMPENSATE JAMES G. CROUSE, CHAIRMAN AND CHIEF EXECUTIVE OFFICER and Objections thereto, and upon reviewing the Briefs submitted relevant thereto, it is hereby ORDERED as follows:

1. The Motion is GRANTED in part, and the Debtors are authorized to compensate James G. Crouse as follows:

 a. In the amount of $100,000.00 annually;

 b. Reimbursement for the expenses of one automobile and any other expenses which were paid by the Debtors pre-petition *and* are reasonable and necessary to the performance of his duties; and

 c. $6,875.00 monthly for the rent of the Debtors' place of business, retroactive to March 16, 1987.

2. However, any payments of Item (a), *i.e.*, salary, cited in paragraph one shall not be paid to the said James G. Crouse immediately, but, instead, payment of this sum shall be suspended in order that it can be retained for a potential setoff against the debts of Mr. Crouse to the Debtors.

3. Paragraph two of this Order may be revised pending developments in the Adver-

sary No. 87–0588S, instituted against the said James G. Crouse by the Creditors' Committee, which proceeding we direct to be prosecuted expeditiously.