**In re NEW YORK CITY SHOES, INC., Debtor.**

**Bankruptcy No. 87–03426S.**

United States Bankruptcy Court, E.D. Pennsylvania.

Aug. 8, 1988.

**480**

Rosetta B. Packer, Klehr, Harrison, Harvey, Branzburg, Ellers & Weir, Philadelphia, Pa., for Creditors' Committee.

Edward C. Toole, Jr., Clark, Ladner, Fortenbaugh & Young, Philadelphia, Pa., for debtor.

Henry F. Siedzikowski, Colleen A. Holt, Philadelphia, Pa., for Richard Royce Collections, Ltd., and Earl Shub.

Thomas E. Biron, Joel C. Shapiro, Blank, Rome, Comisky & McCauley, Philadelphia, Pa., for Goldman.

James J. O'Connell, Ass't. U.S. Trustee, Philadelphia, Pa., U.S. Trustee.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

This is the latest sad chapter in the demise of a briefly-prosperous shoe-store chain chronicled for the most part in our Opinion of April 6, 1988, published at 84 B.R. 947, in an Adversary proceeding commenced against the Debtor to enforce certain trademark rights by the corporate alter-ego of Earl Shub, the line builder probably most responsible for the Debtor's brief period of prosperity. The present matter is a battle in the continuing war between counsel for the Official Unsecured Creditors' Committee (hereinafter referred to as "the Committee"), doubtless frustrated by the paucity of assets available to pay not only their constituents' claims but also their own fees, in light of the rather liberal compensation requested by and previously awarded to Elliot Goldman, the Debtor's Chief Financial Officer (hereinafter referred to as "Goldman"). Putting aside our distaste for the quibbling aspect of the Committee's actions, we believe that they correctly point out that Goldman's brief employment by the purchaser of the Debtor's assets, Orient River Investments, Inc. (hereinafter referred to as "ORI"), undisclosed to the Court and apparently to the Debtor also, simultaneously with his employment by the Debtor, manifested an unacceptable conflict of interests. This conflict also tainted a sale of 30,000 pairs of shoes by the Debtor to ORI for $12,000.00, which was conducted by Goldman without court approval in violation of 11 U.S.C. § 363(b).

We believe that the proper remedy is not, as the Committee suggests, to lop off entirely the $50,000.00 "bonus" to which we held, in a Memorandum of March 11, 1988, that Goldman was entitled. Rather, similar to our reaction to another sort of conflict between an officer of a debtor and the debtor itself in *In re Crouse Group, Inc.*, 75 B.R. 553 (Bankr.E.D.Pa.1987), we shall withhold $50,000.00 from the compensation to which Goldman would otherwise be entitled and deduct all of his compensation since the date of his employment by ORI against this sum. We are also deducting an additional $18,000.00 which we believe may have been lost in the improperly-conducted sale of shoes to ORI for $12,000.00.

As we described in our Opinion reported at 84 B.R. 947, until the instant events came to light, Goldman presented himself as a model employee and a beacon of competency in a morass of incompetent and self-destructive management of the Debtor. *Id.* at 954. On March 10, 1988, the second of two lengthy hearings on objections by the Committee to the compensation of several officers of the Debtor, including Goldman, transpired. The Committee had, by that time, withdrawn its objection that Goldman was entitled to the $78,000.00 annual compensation which the Debtor had agreed to pay him for full-time employment from his date of hire in mid-July, 1987, shortly after the bankruptcy filing, until March 10, 1988. It also agreed that, subsequent to March 10, 1988, Goldman would be compensated at a rate of $300.00 for each day in which his services were needed, provided that he submitted time records and documentation of expenses to the Committee. However, the Committee disputed Goldman's entitlement to a $75,000.00 bonus which Goldman and the Debtor had agreed that Goldman would receive as an alternative to a stock-warrant purchase option if the business were sold. The stock-warrant offer itself became virtually worthless when Debtor was liquidated by the sale of virtually all of its assets to ORI in a transaction approved by this Court on February 1, 1988, and closed on February 23, 1988.

In a Memorandum and Order of March 11, 1988, we concluded that Goldman was entitled to the bonus under the terms of his agreement with the Debtor, but that a reduction of the bonus to $50,000.00 was appropriate to render his compensation non-excessive. This left him with compensation of about $102,000.00 for an eight-month full-time employment engagement. *Compare e.g., Crouse Group, supra* (request of Debtor's chief executive officer for $175,000.00 annually reduced to $100,-000.00 annually); *In re State Optical Co.,* 70 B.R. 82 (Bankr.E.D.Pa.1987) (request of debtor's President for $104,000.00 annually reduced to $88,400.00 annually); and *In re Athos Steel & Aluminum Co.,* 69 B.R. 515 (Bankr.E.D.Pa.1987) (request of debtor's

chief executive for $87,646.00 reduced to $70,000.00 annually). On June 3, 1988, the Committee filed the instant motion asking us to reconsider our March 11, 1988, Order. The grounds set forth were as follows:

1. It had just learned that Goldman had been employed as a consultant by ORI at $1,000.00 weekly for four weeks beginning the date after closing of the transfer of the Debtor's assets to ORI, i.e., February 24, 1988. During this time, Goldman was compensated by the Debtor as a full-time employee through March 10, 1988, and on a per diem basis thereafter. Moreover, during this time, certain disputes arose between the Debtor and ORI regarding the compliance of both parties with the terms of the agreement of sale, leading to ORI's filing an Adversary proceeding against the Debtor, at Adversary No. 88–0491S, on April 25, 1988. Thus, there were definitely issues of not only potential but real conflict between these parties over this period. Additionally disconcerting was the fact that Goldman had not disclosed his dual employment to any counsel or party as of the date of the March 10, 1988, hearing relating to his compensation, despite his testimony on that date.

2. Goldman unilaterally sold 30,000 pairs of shoes not included in the February 23, 1988, sale (referred to as "the warehouse shoes") to ORI for a price of $.40 per pair, or $12,000.00, on or about the date of the closing, without notice and a hearing to interested parties. In addition to claiming this to be in violation of 11 U.S.C. § 363(b)(1), the Committee contended that the price received was inadequate and that the terms could have been influenced by Goldman's employment by ORI.

3. Goldman had failed to submit time records and expense documentation to the Committee prior to receipt of compensation from the Debtor, as promised.

The hearing on the Committee's motion did little but amplify the foregoing facts, which were basically admitted, *ad nauseam.* Goldman offered no explanation for his conduct except an unawareness that he had done anything amiss. We learned, in the course of the hearing, that the Commit-

tee had agreed to withdraw any requests to reduce Goldman's compensation on the basis of his dual employment, apparently because the Committee believed that such action was necessary to assure Goldman's future essential cooperation in the Debtor's affairs, e.g., his testimony at hearings in preference actions and possibly at proceedings to present and confirm a plan.

A surprise witness, Earl Shub, testified that he believed that the "warehouse shoes" sold to ORI for $.40 a pair were in fact worth between $2.75 and $3.50 a pair.

At the close of the hearing, we accorded all of the interested parties an opportunity to file Briefs or supplemental Briefs (the Committee had filed a Brief with its motion) on or before July 15, 1988. We considered each of these carefully in reaching our decision.

The principal arguments presented by Goldman opposing any reduction of compensation despite his admitted at least "technical" impropriety in accepting employment with ORI, were as follows:

1. Goldman's status as a corporate officer or employee cannot be equated with that of a "professional person," within the scope of 11 U.S.C. §§ 327, 330. Therefore, he need not be a "disinterested person" in order to receive compensation and his lack of "disinterested" status is not fatal to payment of compensation to him.

2. The only fiduciary responsibilities that Goldman has or had towards the Debtor were the general duties of a corporate officer to exercise ordinary skill in performance of his duties. (Although not cited by Goldman, we outlined this law in the context of the Debtor's defense against Shub's claims on this theory in our previous Opinion in this case, 84 B.R. at 958). His simultaneous employment by ORI did not breach that duty in the absence of proof of actual losses to the Debtor therefrom.

3. While the Court has the power to review compensation awards to officers sua sponte, it should not do so here because the amounts in issue are small and the Court should not enmesh itself into the internal operation of the Debtor's business.

We agree that there is some question as to whether an officer or employee such as Goldman is a "professional person" within the scope of 11 U.S.C. §§ 327, 330. However, we observe that Chief Judge Twardowski, in the seminal decision of this Court in the area of the court's power to review officers' compensation, In re Zerodec Mega Corp., 39 B.R. 932, 934 (Bankr.E.D.Pa.1984), concluded that § 327 does apply to such parties. Judge Fox followed this conclusion in In re Athos Steel & Aluminum, Inc., 69 B.R. 515, 520–21 (Bankr.E.D.Pa.1987). Without discussing the issue, we followed the reasoning of our brethren on this point in Crouse Group, supra, 75 B.R. at 557. Hence, all of the judges presently sitting in this Court have independently concluded that parties situated similarly to Goldman are, indeed, "professional persons."

However, we are aware of a group of cases in, particularly, the bankruptcy courts for the Southern District of New York reaching a contrary conclusion. E.g., In re Midland Capital Corp., 82 B.R. 233, 239 n. 10 (Bankr.S.D.N.Y.1988); and In re Lyon & Reboli, Inc., 24 B.R. 152, 153 (Bankr.S.D.N.Y.1982). These cases are arguably supported by a decision of our district court suggesting that the term "professional person" should not be applied broadly, in particular, to a collection agency employed by the Debtor in that case. In re Windsor Communications Group, Inc., 68 B.R. 1007 (E.D.Pa.1986).

There is no question that, if Goldman is a "professional person," his compensation must cease no later than the date of his employment by ORI, i.e., February 24, 1988. As of that date, he was employed by an entity that had an interest materially adverse to the interest of the Debtor's estate and hence he was no longer a "disinterested person." 11 U.S.C. § 101(13)(E). See In re Paolino, 80 B.R. 341, 344–46 (Bankr.E.D.Pa.1987) (attorney for Trustee became disqualified from employment and hence for compensation as soon as he became associated with a firm representing conflicting interests, despite no showing of an actual conflict). Compare In re Great-

er *Pottstown Community Church of the Evangelical Congregational Church*, 80 B.R. 706 (Bankr.E.D.Pa.1987) (attorney denied all compensation from the debtor's estate for services rendered for the debtor because he solicited and received small compensation for filing proofs of claim for creditors against the estate).

■ However, we believe that, even if Goldman is not classified as a "professional person" and hence need not be totally "disinterested" to receive compensation, his simultaneous employment by the Debtor and by ORI nevertheless constitutes an intolerable actual conflict. Even when an employee of the debtor need not be "disinterested," he cannot be employed or compensated from a debtor's estate if he has any interests potentially adverse to the estate. *Cf. In re G & H Steel Service, Inc.*, 76 B.R. 508, 510–11 (Bankr.E.D.Pa.1987) (special counsel cannot be appointed for debtor if counsel has a potentially adverse interest in the estate, even though he need not be "disinterested").

The controlling pronouncements on the duties of corporate officers emanate from the Supreme Court's decision in *Wolf v. Weinstein*, 372 U.S. 633, 642–45, 83 S.Ct. 969, 975–77, 10 L.Ed.2d 33 (1963). There, the Court held that officers and directors of a debtor corporation are fiduciaries and were totally barred from receiving any compensation by their actions of trading in the debtor corporation's stock. We do not agree with Goldman's suggestion that the result in *Wolf* turns solely upon the particular language of § 249 of the former Bankruptcy Act. Rather, we believe that the Court's decision was motivated by application of the broad principle that no conflicts on the part of a corporate debtor's officers could and would be tolerated, irrespective of the wording of the Act and no matter how harsh the consequences. We note that Judge Twardowski, in *Zerodec, supra*, 39 B.R. at 934–35, and, later, we ourselves, in *Crouse Group, supra*, 75 B.R. at 557–58, directly applied the principles of *Wolf* to employment and compensation of corporate debtors' officers under the Bankruptcy Code.

We therefore conclude that Goldman's employment by ORI constituted an improper and intolerable conflict of interests irrespective of whether Goldman was properly characterized as a "professional person." Consequently, Goldman must be barred from receipt of any compensation for any services performed by him for the Debtor after the date of his employment by ORI on February 24, 1988.

■ We do not doubt our power to review the issue of Goldman's compensation irrespective of the Committee's disability in raising this claim due to its withdrawal of same on the belief that it was well-advised to do so to assure Goldman's cooperation in resolving the outstanding matters in this case. We cannot allow the absolute principles barring conflict to be compromised by a need to curry the favor of the wrongdoing officer who enters into a conflict situation.

In *Athos, supra*, Judge Fox considered the merits of objections to the compensation of the debtor's chief executive officer, despite finding that the impetus of the objections was a tainted source, i.e., the brother of the officer, who, as the court held, was without standing to raise the objections due solely to a contention that allowing the officer's request would cause indirect injury to his own reputation. 69 B.R. at 519–20. Even in *Lyon & Reboli, supra*, 24 B.R. at 153–55, where the court concluded that § 327 of the Code was inapplicable, the court found that it had power to review an officer's compensation *sua sponte*, and did so. We disagree with Goldman's suggestion that the conflict and the monetary figures involved are *de minimis* and that no review, under the standards of *Athos* or *Lyon & Reboli*, would be appropriate. To the contrary, the element of a conflict with the debtor's interests on behalf of the officer was not in issue in either of those cases. The presence of that element here makes our review of Goldman's compensation much more pressing, mandating our involvement *sua sponte*, irrespective of the Committee's stance.

The really difficult problem is framing a remedy. The fear that Goldman, who is

virtually indispensable, would be driven away by too harsh of a penalty for his indiscretion was apparently a motivating factor for the Committee's withdrawing its objections, at least as to Goldman's receipt of future compensation. We believe that the most closely analogous set of facts to those here presented in any case which we have uncovered in any jurisdiction are those presented in our own case, *Crouse Group, supra.* We shall therefore attempt to apply our approach in that case to the facts here.

We also do not believe that any remedy short of denying all compensation to Goldman is in any sense too harsh, given the instant factual circumstances. As *Wolf* and *Greater Pottstown Community Church* teach, the traditional remedy for any act in conflict of the debtor's interest is total denial of *all* compensation. *See also, e.g., Woods v. City National Bank & Trust Co.,* 312 U.S. 262, 61 S.Ct. 493, 85 L.Ed. 820 (1941) (conflict bars all compensation to indenture trustee, a bondholders' committee, and its counsel despite that no fraud or unfairness actually resulted from the conflict).

■ First, we must consider the appropriate remedy for Goldman's unilateral, undisclosed sale of 30,000 pairs of shoes to ORI for $12,000.00 without court approval, in violation of § 363(b). We would observe that the failure to provide notice of such a sale, as required by § 363(b), normally renders the entire sale voidable, if not void. *See, e.g., M.R.R. Traders, Inc. v. Cane Atlantique, Inc.,* 788 F.2d 816, 818 (1st Cir.1986); *In re First Baptist Church, Inc.,* 564 F.2d 677, 679 (5th Cir.1977); *In re Stanley Engineering Corp.,* 164 F.2d 316, 318 (3d Cir.1947), *cert. denied,* 332 U.S. 847, 68 S.Ct. 351, 92 L.Ed. 417 (1948); *In re Fernwood Markets, Inc.,* 73 B.R. 616, 619, 621–22 (Bankr.E.D.Pa.1987); and *In re Foster,* 19 B.R. 28, 29 (Bankr.E.D.Pa.1982). We note, however, that the Committee has not requested that we set aside the sale.

■ For purposes of fashioning a remedy, we shall therefore estimate the potential damage to the estate caused by this action. We believe that, had he received notice of the sale, Mr. Shub, for one, may well have placed a bid in excess of the $12,000.00 received from ORI for the "warehouse shoes." However, considering the difficulties he would probably have encountered in transporting the "warehouse shoes" to his own facilities, we believe that Mr. Shub, although placing the value at three times more, would have bid no more than $1.00 per pair for the shoes. We shall therefore measure the damage to the estate and assess same against Goldman at the $30,000.00 likely bid of Mr. Shub, less the $12,000.00 received, or $18,000.00.

■ Consistent with our statements at the hearing on July 6, 1988, and the result in *Paolino, supra,* we hold that Goldman cannot receive any compensation for services on or subsequent to February 24, 1988, at which time he began employment by ORI. Once tainted by this conflict, all of his duties for the Debtor thereafter becomes non-compensable. Again, this is a considerably less harsh penalty than the traditional one of denying him all compensation.

We do not share the Committee's fear that Goldman will cease performance of his duties because of our taking action to reduce his compensation. Despite our belief that Goldman committed a serious impropriety here, our general perception of his integrity and competence continues to be high. He had candidly admitted his employment with ORI at this point, and admits that this was in error. Although meting out a penalty, as it were, to Goldman, we have not lost our respect for him. We believe that he will, irrespective of our actions, fulfill his duties to the Debtor as strongly as we believe that the conflict here was, as Goldman indicates, simply not apparent to him. Of course, the fact that the conflict and the difficulties that it could create were not perceived by him even if we credit his testimony in this regard does not mean that we can overlook them. In our view, the fact that the conflict was overlooked renders it all the more important that we spell out the unacceptability of this conduct for those who might be placed in a similar position in the future.

Moreover, a conflict is like a disability that we cannot ignore. If Goldman became physically disabled and unable to assist the estate in the future, the estate would have to bear up to this loss of manpower. So here, it must bear up to the losses resulting from the conflict of interests which disables Goldman.

However, in order to allay the Committee's concerns as best we can, we shall attach a self-enforcing mechanism to prevent receipt of compensation which we must deny to Goldman, yet encourage his continued participation on behalf of the Debtor. Similar to our Order in *Crouse Group*, we shall permit the estate to offset sums otherwise payable to Goldman against his future services for which he will not be compensated. There, we allowed the debtor's officer to be compensated at $100,000.00 per annum, but required this sum to be set off against the $1.5 million debt owed by the officer to the Debtor.

Here, while not revoking our award of the $50,000.00 bonus, as the Committee requested, we shall direct that the sum, presumably not yet paid, be withheld from the compensation due to Goldman. The $18,000.00 penalty from the sale and all sums earned by Goldman on and subsequent to February 24, 1988, shall be deducted from the $50,000.00. None of the remainder of the $50,000.00 otherwise due to Goldman shall be paid to him until we receive an accounting of his services from February 24, 1988, to the date when the Debtor determines that his services are no longer needed. He shall then be paid the difference between $50,000.00 and the sum of $18,000.00 and the compensation for his services performed on or after February 24, 1988, by the Debtor. If he defaults in his performance of future services for the Debtor reasonably requested, the entire balance of the $50,000.00 shall be forfeited, and he may be ordered to repay sums previously paid to him. If the difference is $50,000.00 or more, Goldman will of course not receive any of the $50,000.00 and will be ordered to repay any sums paid in excess of $50,000.00.

An Order consistent with our conclusions expressed herein will be entered.

## ORDER

AND NOW, this 8th day of August, 1988, after a hearing on July 6, 1988, on the Motion of the Official Committee of Unsecured Creditors of New York City Shoes, Inc. for Reconsideration of the Claim of Elliot Goldman Pursuant to Bankruptcy Rule 3008 and the Briefs of all interested parties, it is hereby ORDERED AND DECREED as follows:

1. The Motion is GRANTED in part.

2. The Debtor shall retain the sum of $50,000.00 from the sums due to be paid to Elliot Goldman (hereinafter referred to as "Goldman") pursuant to our Order of March 11, 1988, in a separate special account. If the Debtor has already paid this sum to Goldman, such that the amount presently due to Goldman is less than $50,-000.00, Goldman shall repay the Debtor an amount necessary to allow the Debtor to retain $50,000.00 in this account, within thirty (30) days.

3. Although compensation may be advanced to Goldman pursuant to an Order of March 11, 1988, no sum shall be paid to Goldman from this special account until he has completed all of his duties on behalf of the Debtor to the satisfaction of the Debtor and the Committee and has submitted to the Debtor, the Committee, and the Court a statement of all compensation earned from February 24, 1988, and thereafter.

4. Upon Order of this Court after notice and hearing, Goldman shall be paid the amount of $50,000.00, less the sum of $18,-000.00 reflecting the damages to the Debtor from the improper sale of the "warehouse shoes" and the amount of compensation earned pursuant to the Order of March 11, 1988, since February 24, 1988. If this amount is a negative figure, Goldman shall repay all sums in excess of $50,000.00 to the Debtor's estate.

5. If this court finds that Goldman failed to satisfactorily perform his duties for the estate reasonably requested from him hereafter, the court may direct that

486

the entire balance of the sum in the special account be forfeited and/or that Goldman repay such sums as are determined to be appropriate to the estate.