In re MIDLAND CAPITAL CORPORA-
TION, Midland Venture Capital
Limited, Debtors.

Bankruptcy Nos. 85 B 11894 (PBA), 85
B 11895 (PBA).

United States Bankruptcy Court,
S.D. New York.

Jan. 14, 1988.

[black redaction bar]

Donovan Leisure Newton & Irvine by Kenneth Newman and Christopher Johnson, New York City, for applicants John A. Callahan and Joseph F. Bradway, Jr.

Zalkin, Rodin & Goodman by Richard S. Toder and Neil Herman, New York City, for James P. Hassett, the chapter 11 trustee.

Rosenman Colin Lewis Freund & Cohen by Robert Michaelson, New York City, for the Creditors' Committee.

## MEMORANDUM DECISION ON APPLICATION OF JOHN A. CALLAHAN AND JOSEPH F. BRADWAY, JR. FOR ORDER DIRECTING CHAPTER 11 TRUSTEE TO PAY SALARY AND REIMBURSE DISBURSEMENTS

PRUDENCE B. ABRAM, Bankruptcy Judge.

John A. Callahan ("Callahan") and Joseph F. Bradway, Jr. ("Bradway") (collectively "Applicants") have sought an order directing James P. Hassett, the Chapter 11 trustee of these debtors ("Trustee" or "Hassett"), to pay them a combined salary of $150,000 (five months at the rate of $30,000 a month) and reimburse expenses of $59,605.82, which amounts they claim they are entitled to as unpaid expenses of administration. The Trustee opposes the application on the grounds that the amounts sought are too high and are not properly charged to the debtors.

Both the Trustee and the Creditors' Committee deny that any binding employment contract exists with the Applicants and assert that compensation, if any, to Applicants would have to be based on quantum meruit. Bradway and Callahan were the operating officers of the debtors in possession during the five months before the Chapter 11 trustee was appointed. They did not pay themselves the salaries and expenses they are now requesting before the Trustee was appointed because of the poor cash position of the debtors. The Trustee has on hand funds substantially in excess of the amounts being sought and thus consideration of the motion is now appropriate. In addition to the extensive pleadings and memoranda of law submitted by the parties, hearings were held and testimony was taken on the application over three days.

This court concludes that the Applicants are entitled to compensation on the basis of quantum meruit to the extent that the amounts sought are actual and necessary compensation and expenses for services rendered after the commencement of the case and that the $30,000 per month rate of compensation specified in the management agreement which was never court approved is not controlling. For the reasons which follow, the court fixes compensation at $75,000 and authorizes reimbursement of expenses of $10,286.27.

## STATEMENT OF FACTS

Midland Capital Corporation ("Capital"), one of the two debtors, is a publicly held company and the parent of Midland Venture Capital Limited ("Venture"), the other debtor (collectively, "Midland" or "Debtors"). In addition to owning Venture, Capital was engaged in manufacturing and distributing precious metal jewelry through a non-wholly owned subsidiary, Arrowhead Jewelry Corporation ("Arrowhead"). Venture was engaged in the business of providing venture capital financing to small business entities.

As a result of a change in accounting treatment of its investments in the first half of 1985, Midland made adjustments to its balance sheet which reduced shareholders' equity by $20,052,254 and which reduced stated assets from $46,769,845 as of December 31, 1984 to $24,704,738 as of June 30, 1985. Shareholders' equity went from a positive $25,031,103 to a negative $1,784,506 in the same period. Midland experienced an additional loss on its investment in Tacoma Boatbuilding Co. when that company filed a Chapter 11 petition at the end of September, 1985.

The Applicants first became involved with Midland in late October, 1985. They

were not then officers, directors, shareholders or creditors of Midland. The involvement of the Applicants with Midland came about through a member of the Midland Board who was also on the board of VHC, Ltd., f/k/a Vitality Unlimited, Inc. ("VHC"), a publicly owned holding company of which Bradway and Callahan own 50% and of which they are officers and directors. On October 22, 1985, the Boards of Directors of Capital and Venture requested Bradway and Callahan to undertake a review of Midland with a view toward the purchase of, or investment in, Capital or any or all of its subsidiaries or investments due to the severe financial difficulties then being experienced by Midland. On the same date, the Boards procured the resignation of Midland's two co-chief executive officers and managing directors. The Boards asked Bradway and Callahan to prepare a written report as soon as possible.

By letter dated October 25, 1985, addressed to Bradway, Midland outlined the confidentiality and non-exclusive terms on which it was allowing VHC to investigate Midland and requested that a written report be received by Midland not later than November 11, 1985. Bradway replied by letter dated October 28, 1985 agreeing to the terms of the October 25 letter with two conditions. The caveats were that the ability to meet the November 11 date depended on the flow of information from Midland and that the written report was for the "eyes and ears" of the Midland Board only.[1] By separate three-page letter dated October 28, Bradway made a detailed request for information from Midland.

The Applicants did subsequently prepare a report dated November 11. They concluded in the report that Midland needed a cash infusion of $3 to $5 million to continue in business for any length of time. It was the Applicants' opinion that that sum could not be raised in the public marketplace and

that the only immediate source would be large shareholders and/or directors. The summary recommended a number of steps assuming the cash infusion. The steps included hiring a chief executive officer, instituting meetings with creditors and shareholders, taking actions relative to the operations of Arrowhead, vacating the premises at 950 Third Avenue in New York City and considering their relocation at Arrowhead's headquarters in California, and developing a business plan for repayment of creditors.

The summary concluded that many of Midland's investments were worth considerably less than original cost and that as Arrowhead was the only earning asset that sale of Arrowhead would seem unwise. Reference was made to recent Arrowhead projections for 1986 net income ranging from $5,614,000 down to $4,034,000. The summary ended:

> "In conclusion, with the infusion of cash, it is possible that Midland could ultimately work itself out of its fiscal dilemma. The ability to do so will be directly related to the person running the company, and the confidence the creditors have in that person.[2] The task is no small undertaking."

The Midland Boards held a meeting on November 14, 1985 at which they reviewed and discussed Applicants' November 11 report. The Applicants advised the boards at the meetings that the future of Midland was irrevocably tied to the performance of Arrowhead and recommended the filing of a Chapter 11 petition by Midland in the near future in order for the Debtors to have the time necessary to reorganize. The Applicants also indicated that they would be willing to become officers and directors of Midland as well as of Arrowhead and that they would require an aggregate salary of $30,000 per month, plus expenses.[3] They also wanted to obtain war-

---

**1.** It is apparent from this caveat that VHC wanted to preserve for its own benefit in making an investment in or acquisition of any or all of Midland the ideas it had about how to obtain value from Midland and its assets and not have

this information given by Midland to another acquiror.

**2.** This comment proved to be prophetic.

**3.** The minutes of the November 14, 1985 Board Meeting go on to say that the Applicants "stated

rants to purchase stock of the Debtors and rights to additional shares in the future. The Applicants proposed a management agreement embodying these terms.

The Boards then unanimously elected the Applicants as directors and officers of Midland. The Boards also directed the preparation of a management agreement which provided for the management services to be provided by the Applicants on the terms and conditions discussed at the meeting and provided that the agreement was to be approved prior to its execution on behalf of the Corporation by the Board of Directors.

Bradway and Callahan promptly accepted their elections as officers and directors of Midland. A few days later on November 18, 1985, Bradway and Callahan caused the Boards of Midland to meet and approve resolutions authorizing the filing of Chapter 11 petitions and the retention of bankruptcy counsel.[4] The petitions were filed on November 19, 1985. Of relevance to the present motion, the affidavit required by the local rules which was annexed to Capital's petition stated:

"The amounts now being paid and proposed to be paid for services to be rendered by officers and directors of Midland, as employees, for a period of thirty (30) days following the filing of the Chapter 11 petition is approximately $30,-000.00." Affidavit of Jos. F. Bradway, Jr. sworn to November 18, 1985.

The affidavit annexed to the Venture petition stated a zero figure for prospective payments to officers and directors. Joint administration of the Capital and Venture cases was ordered.

The Debtors continued as debtors in possession under the stewardship of the Applicants until mid-April 1986. In early April, 1986, the Creditors' Committee submitted an application seeking the Applicants' removal and detailing a number of areas of dissatisfaction with Applicants. On April 18, 1986, Bradway and Callahan resigned because it was apparent that they had lost the confidence of the Creditors' Committee. The Committee's application was withdrawn as a result of Applicants' resignations and is not part of the court's records. Thereafter, Hassett, a non-lawyer with a substantial background in business as well as prior experience as a bankruptcy trustee, became the Chapter 11 Trustee.

Callahan testified at the trial on the Application that between November 14, 1985 and April 18, 1986, he spent approximately 35% of his time on Midland-related activities. During the same period, Bradway spent approximately 75% of his time on Midland-related activities. Although neither Bradway nor Callahan had had prior experience with Chapter 11 reorganizations, both of them have substantial business backgrounds. Bradway, the younger of the two men, had been associated with a New Jersey bank for a number of years, serving at various times as president, chief executive officer and chairman of the board. He had been the Mayor of Atlantic City, New Jersey. In addition, he had been the chairman and chief executive officer of a company listed on the American Stock Exchange. Callahan had been for many years an executive at a large company, had thereafter assisted in a substantial liquidation for another company, had been the Chairman of the Board of Directors of several companies and been on the Board of a publicly held company.

Bradway and Callahan both testified that they considered their $30,000 monthly combined salary to be modest in light of their business backgrounds and the services required. The Applicants testified that $30,-000 was the least they would have been willing to take in light of the amounts received by Midland's former management and of the salaries they were used to commanding. They stated that they proposed the number to Midland, which accepted it without negotiation.

---

they would have the corporation accrue, but not actually pay, until they had found a source for a capital infusion."

**4.** The Arrowhead board also met on the same date and authorized the filing of a Chapter 11 petition for Arrowhead. No petition was then filed for Arrowhead as a result of discussions with Arrowhead's banks. See Trial Transcript, 3/20/87 at 53–54.

Bradway spent much of his time while with Midland attempting to deal with management and operational problems at Arrowhead. Bradway made key personnel changes at Arrowhead. In early January, 1985, a minority shareholder of Arrowhead instituted an action in California challenging the validity of the election of Bradway and Callahan to the Arrowhead board. Although that action was successfully defended in a brief time, the action is reflective of the hostile atmosphere then prevailing between Midland and the minority shareholders of Arrowhead, who were active in Arrowhead's day-to-day operations. As stated earlier, the Applicants viewed Arrowhead as the only Midland asset which had the capacity to generate any significant future income stream.[5] Although the Arrowhead stock was pledged to a bank creditor of Midland, Bradway testified at trial that it had been his view that the potential cash flow from Arrowhead would be sufficient to pay off the creditor in a reasonable time.

The Applicants also caused the Debtors to reject the lease for their premises at 950 Third Avenue in New York City and move to smaller premises in the same building which had been leased by VHC, the Applicants' company. This move reduced Midland's monthly rental expense by approximately $25,000 per month.

In addition, the Applicants investigated Midland's other investments and initiated efforts to recover on them. Just prior to their resignation, Applicants had proposed entering into an option agreement giving Financial Protection Services ("FPS") a 90–day period in which to purchase all of Midland's interests in FPS for $2,250,000.[6]

Much of the trial was taken up with the question of whether any revised management agreement between the Debtors and Arrowhead on the one hand and the Applicants on the other had been signed after the December 18 board meeting. Various executed copies were produced at trial. The court finds it unnecessary to determine how and when the various versions were executed or whether any were validly executed by Arrowhead since (1) no application for approval of the management agreement was ever made to the court, (2) none of the versions differ with respect to the $30,000 per month salary, and (3) the Applicants are making no claim for stock, warrants or severance pay.

With regard to the reasonable value of the Applicants' services, the Trustee stated his opinion that an acceptable range of annual compensation for a full-time chief executive officer of companies similarly situated to Midland would be a total compensation package of between $125,000 and $250,000. The Trustee testified that since the Applicants were retained on a basis that did not set any requirements as to the amount of time, energy or skill to be expended by them on Midland's affairs and since other benefits and incentives such as the warrants and stock position were involved, the salary should be markedly reduced. The Trustee stated that if any compensation was to be awarded to Bradley and Callahan that it should not exceed $62,500 ($12,500 per month × 5 months), an amount based on an annual salary of $150,000 per annum.

The Applicants, who both had long and successful business careers, devoted all of the time they viewed as necessary to manage Midland's affairs appropriately. They developed a plan of approach. There was no showing at trial that the time they devoted was in fact inadequate. Nor does it appear that they had any incentive to spend less than the necessary amount of time. Their economic interests as equity

5. After his appointment in April, 1985, the Trustee unsuccessfully attempted to find a chief executive officer for Arrowhead and then took a hands-off position with regard to Arrowhead after he was unable to obtain officers' and directors' liability insurance. On January 7, 1987, Arrowhead filed its own Chapter 11 petition and it appears improbable that Midland will receive any return on its investment in Arrowhead.

6. The Trustee ultimately disposed of all of Midland's interests in FPS in the fall of 1986. The successful purchaser was FPS who raised its initial offer of $2.5 million to $3.0 million after a bidding contest.

participants could only be furthered if they did use their best efforts to rehabilitate the Debtors or salvage something from their investments.

The various business decisions made by the Applicants can, of course, be faulted in retrospect. However, it appears to the court that the decisions themselves were within the bounds of reasonable business judgments. Where the Applicants faltered was in dealing within the management constraints of the fishbowl business environment that is Chapter 11.

Bradway and Callahan knew little of the Chapter 11 process at the outset of these cases. They never became conversant with the significant legal aspects of the bankruptcy process, being content to leave that to Midland's bankruptcy lawyers. The loss of confidence in the Applicants by the Creditors' Committee appears to have been directly attributable to inadequate communication by the Applicants with the Committee and Applicants' apparent insensitivity to the need to develop a consensus with the Committee about their business plan for Midland. In late January 1986, when the Creditors' Committee was just formed, the court had approved a transaction in which it was disclosed that the Applicants had a personal interest.[7] Failure to cause the management agreement to be submitted for court approval no doubt created a significant credibility problem for the Applicants because it must have left the Committee feeling that it was in the dark and therefore uneasy about the Applicants' motives for being involved with Midland and their compensation expectations.

## DISCUSSION

Applicants assert that the amounts they seek for salary and expenses are entitled to be allowed as administrative expenses. Bankruptcy Code § 503(a) permits the filing of a request for payment of an administrative expense, which is what the Applicants have done.

Code § 503(b) provides that after notice and a hearing

"there shall be allowed administrative expenses * * * including—

(1)(A) The actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case * * *"".

At the outset, it must be acknowledged that the type of claim being made by the Applicants is within the scope of those which are generally agreed can be administrative expenses as the claim is one for salary for services rendered and expenses incurred after the commencement of the case. The Trustee urges that since in his view the amounts sought by the Applicants are excessive, the claim should not be allowed as administrative expenses because it is not for the "actual" and "necessary" costs of "preserving the estate".

The Applicants concede that their contract, which contract was negotiated and the key terms settled on prior to the filing of the Chapter 11 petitions, was never submitted to the bankruptcy court for approval. Whether there is a prepetition contract for payment of the $30,000 per month raises the legal issues which underlie the well-known Texaco–Pennzoil dispute.[8]

■ The principles governing the effect of pre-petition contracts prior to assumption or rejection are the following:

"The claim of a creditor having an executory contract with the debtor at the

---

**7.** In the transaction approved, a subsidiary of VHC acquired property in which Midland had or had had an interest from the holder a security interest in the property.

**8.** See *Reprosystem, B.V. v. SCM Corp.*, 727 F.2d 257, 261 (2d Cir.1984); *V'Soske v. Barwick*, 404 F.2d 495, 499 (2d Cir.1968), *cert. denied*, 394 U.S. 921, 89 S.Ct. 1197, 22 L.Ed.2d 454 (1969) ("First, if the parties intend not to be bound until they have executed a formal document embodying their agreement, they will not be bound until then; and second, the mere fact that the parties contemplate memorializing their agreement in a formal document does not prevent their informal agreement from taking effect prior to that event. * * * These rules, placing the emphasis on intention rather than form, are sensible and reasonable."); and *Banking and Trading Corp. v. Floete*, 257 F.2d 765, 769 (2d Cir.1958). See also New York General Obligations Law § 5–701.

time the debtor's petition is filed is entitled to priority under these provisions only if the trustee or debtor in possession elects to assure the contract or if he receives benefits under it. * * * The right to priority in the event the trustee or debtor in possession receives benefits under the contract during the interval between the filing of the debtor's petition and the rejection of the contract 'is an equitable right based upon the reasonable value' of the benefits conferred, rather than upon the contract price." *American Anthracite & Bituminous Coal Corp. v. Arrivabene,* 280 F.2d 119, 124 (2d Cir.1960). The purpose of according priority is fulfillment of the equitable principle of preventing unjust enrichment of the debtor's estate rather than the compensation of the creditor for the loss to him. *American Anthracite,* 280 F.2d at 136.

By virtue of the amendments to Code § 365(d)(3) in 1984,[9] the agreed contract price has been made controlling only in the case of an unexpired lease of nonresidential real property. Thus, this court would be free to award an amount other than the contract amount even if it found there was a pre-petition contract. Detailed analysis as to whether there was a pre-petition contract or only a post-petition one is unnecessary since court approval would be required in either event to render the contract amount controlling. Assumption of a pre-petition contract requires court approval. See Code § 365(a). Court approval is also required for the debtor in possession to enter into transactions out of the ordinary course of business.

The contract with the Applicants is not an ordinary course of business transaction. The Debtors had ceased their customary operations, their future was in severe doubt, they had virtually no operating funds and the management agreement provided for the grant of stock options as part of the consideration.[10] There was no "ordinary course" to the Debtor's business. Indeed, it is questionable whether employment agreements with top management can ever qualify as ordinary course of business transactions even when the debtor is operating normally.

■ This court is satisfied that the reasonable value of the benefits conferred on the Debtors is less than the contract-based amount sought by the Applicants. The Applicants are not entitled to sympathy in being denied compensation at the agreed rate. They understood that court approval of the management agreement was required but failed to obtain court approval or even have an application for approval filed either by counsel for the Debtors or by their own counsel.

It has been argued that the Applicants are not entitled to compensation at all because the minutes of the November 14 Board meetings indicate the Applicants stated that they would allow the salaries to accrue until they found a source for capital infusion, which they never found. This objection may be quickly disposed of. The management agreement reviewed by the Board and approved subject to change at its December 18 meeting contains no such provision. The Applicants did indeed defer their compensation during the debtor in possession period because of the Debtor's poor cash position. Finally, at the time the Applicants resigned, counsel to the Creditors' Committee acknowledged that the Applicants were not "volunteers" meaning that they would be entitled to compensation in an unspecified amount for their efforts. The Applicants were the management of the Debtors and not an additional expense overlay on existing management. This court holds that under the circumstances

9. In *American Arthracite,* the Second Circuit stated that no rational basis existed for drawing a distinction between the right to priority where contracts for the lease of real property are concerned and the right where other kinds of contracts are involved. 280 F.2d 125. Congress has provided a rational basis for courts to make such a distinction by amending Code § 365.

10. This court does not agree with those cases that hold Code § 327 applies. See e.g., *In re The Crouse Group, Inc.,* 75 B.R. 553 (Bankr.E.D.Pa. 1987). Executive officers are simply not "professional persons".

they are entitled to a quantum meruit award for their services.

The Trustee also urges that there was no valid contract with the Applicants because the management agreement was never properly executed by Arrowhead. Since the court has held that it is not bound by the contract rate, Arrowhead enters in only as a factor to be considered in determining the compensation to be allowed.

■ The court has determined that it should award compensation at the rate of $15,000 per month or $180,000 per annum, an amount which is one-half of that sought. Review of the circumstances of Bradway's and Callahan's retention lead to the conclusion that the $30,000 figure was predicated on a three-corporation agreement—Capital, Venture and Arrowhead. No distinction of substance can be made between Capital and Venture in terms of the handling of their affairs and they may be considered as one. Arrowhead was a company of significant size with stated assets of almost $33 million at the end of 1984, annual revenues in excess of $80 million in 1985 and over 600 employees. Its principal business operations were located in California. Bradway and Callahan became directors of Arrowhead. The trial testimony was that a substantial portion of Bradway's time was devoted to Arrowhead's affairs. This Arrowhead effort necessarily had a dual character as Bradway was a director of Arrowhead in addition to being a director and officer of Midland and thus had direct fiduciary responsibilities to Arrowhead. Although the court accepts Bradway's testimony that he was of the view in early 1986 that the lien on the Arrowhead stock could be paid off to the benefit of Midland, this does not compel the conclusion that the entire expense of Bradway's services relative to Arrowhead should be borne by Midland. Midland has not received any financial benefit from its Arrowhead investment during or after the Applicants' tenure. Arrowhead continued to operate without

court protection for over a year after the Midland cases were filed. This court concludes that it is reasonable to fix compensation by looking to the total services contemplated to be rendered for the $30,000 contract rate. It is reasonable to allocate them evenly between Midland and Arrowhead. That results in a $15,000 per month compensation figure. The court does not consider it necessary to adjust that figure further for the warrants and stock, which were speculative when granted and are concluded to be worthless at this time. Compensation for services rendered by Applicants of $75,000, or $15,000 times five months, will be allowed.

## EXPENSE REIMBURSEMENT

Applicants also seek reimbursement of expenses totalling $59,604.82. The Trustee has no objection to reimbursement of expenses totalling $10,286.27.[11] The expenses which the Trustee does not agree should be reimbursed to the Applicants are (a) those for rent on the 31st floor premises at the rate of $7,166.67 per month; (b) those for the law firm of Hill, Lewis, Adams, Goodrich & Tait ("Hill, Lewis"), in the amount of $5,911.75; and (c) those for the law firm of Donovan, Leisure, Newton & Irvine ("Donovan, Leisure") in the amount of $7,573.45.

### (A) The Rent Claim

■ As discussed *supra*, the Applicants arranged early in their tenure for Midland to move from the 11th floor to smaller quarters on the 31st floor in the same building. The Applicants seek to be reimbursed for the rent for those premises from and after July, 1986, when the Trustee vacated the 31st floor premises. The lease for the premises is not itself an obligation of Midland as the named tenant is VHC, the Applicant's corporation. The lease expired by its own terms on July 31, 1987.

---

11. The expenses to which no objection is made are the following:

| | | |
|---|---|---|
| (i) | Moving Expenses – 11th to 31st Floor | $1,609.50 |
| (ii) | New York Telephone Bills | 199.73 |
| (iii) | AT&T Bills | 2,085.00 |
| (iv) | Leasing Expenses for "Merlin" type phones | 2,292.04 |
| (v) | New York Telephone Deposit | 4,100.00 |
| | | $10,286.27 |

The Trustee states that at his first meeting with Applicants after his appointment he inquired what the terms of the lease arrangement for the space were and that Applicants advised him that Midland could terminate its occupancy on 90 days notice. The Trustee thereupon gave notice and vacated the premises on or before June 30, 1986. The Applicants do not dispute the Trustee's version of events. However, they state they are now unwilling to have VHC bear the expense of the space in light of the Trustee's position on their compensation request.

This court finds that the Applicants are estopped to change their position. The Trustee acted in reliance on the information provided him, gave notice, vacated the premises and secured new premises at a lesser cost.

This portion of the expense request is denied.

### (B) *Hill, Lewis*

 The Applicants consulted Hill, Lewis, a Michigan firm, to obtain legal advice respecting various securities law issues involving Midland. The Hill, Lewis firm has never been paid by Applicants. The time records of the Hill, Lewis firm reflect that the firm drafted an application for retention that for unknown reasons was never completed or submitted. The failure to secure court approval is fatal to this expense request. This court cannot permit payment to the Hill, Lewis firm to be made by the indirection of allowing reimbursement as an expense to the Applicants when the Hill, Lewis firm is not itself entitled to compensation from the estate because it never secured a retention order.

### (C) *Donovan, Leisure*

The Donovan, Leisure expense claim stands on a different footing than the Hill, Lewis one as Donovan, Leisure represented Bradway and Callahan in connection with the termination of their employment in April, 1986. The requirement of court-approval retention is inapplicable as Donovan, Leisure was not representing Midland.

The Applicants' right to reimbursement depends instead on whether this type of expense was included in the type of expenses that Midland through its Boards agree to reimburse Bradway and Callahan. This court finds that it was not. There was no discussion of this type of expense either at the Board meetings or in the contract ultimately drafted. It is a personal expense of the Applicants for which reimbursement is not appropriate.

### CONCLUSION

The court finds the Applicants, Bradway and Callahan, entitled to compensation of $75,000 and expenses of $10,286.27, allowable as an expense of administration.

The Trustee is directed to settle an appropriate order in accordance with the awards made and providing for payment at this time.