**In re AQUA ASSOCIATES, a Pa. Limited Partnership, Debtor.**

**Bankruptcy No. 90–13542S.**

United States Bankruptcy Court, E.D. Pennsylvania.

Jan. 17, 1991.

Melvin Lashner, Philadelphia, Pa., for debtor.

William T. Steerman, Philadelphia, Pa., for Third Mortgagee.

James J. O'Connell, Ass't. U.S. Trustee, Philadelphia, Pa., U.S. Trustee.

Kerry S. Schuman, Jenkintown, Pa., for Fay Goodman.

Steven R. Geroff, Philadelphia, Pa., for Second Mortgagee.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

## A. INTRODUCTION

Presented is a motion of the Debtor, the sole asset of which is a large building situated at Ninth and South Streets in Philadelphia, to obtain credit which contemplates providing a first lien on the building to the new lender over the objection of the incumbent first mortgagee, pursuant to 11 U.S.C. § 364(d). We hold that a qualitative analysis, similar to that performed by us in *In re Crouse Group, Inc.*, 71 B.R. 544, 549–51 (Bankr.E.D.Pa.1987), must be made as to any request to obtain credit. We also hold that an analysis focusing on the Debtor's reorganizational prospects, similar to that suggested in, *e.g., In re Franklin Pembroke Venture II*, 105 B.R. 276, 277–78 (Bankr.E.D.Pa.1989), rather than a mere determination of whether there is an "equity cushion," must be made before we can determine whether the lender being primed is adequately protected, as required by 11 U.S.C. § 364(d)(1)(B). Applying these holdings to the instant motion, we find that the aforementioned criteria are mostly met because the credit requested is necessary to the furtherance of a potentially-feasible plan of reorganization of the Debtor, and it appears, generally, to be on appropriate terms. However, we shall require the Debtor to make one further effort at a less expensive loan package before approving same.

## B. PROCEDURAL AND FACTUAL HISTORY

AQUA ASSOCIATES ("the Debtor") filed a voluntary petition under Chapter 11 of the Bankruptcy Code on August 29, 1990. On December 10, 1990, the Debtor filed both a plan of reorganization ("the Plan") and the instant motion to incur secured debt ("the Motion"). After a status hearing of December 12, 1990, an Order of December 14, 1990, was entered requiring the Debtor to file a disclosure statement ("the D/S") to accompany the Plan by January 11, 1991, and a hearing on the propriety of the D/S was scheduled on February 13, 1991. On January 9, 1991, the Debtor filed an Application to extend the date of the filing and the hearing on the D/S, respectively, until after the Motion was decided. Our accompanying Order grants this Application.

The Motion was scheduled for an expedited hearing on January 2, 1991. The Debtor called several witnesses, including William J. Steerman, Esquire, its nonbankruptcy counsel; Harvey M. Levin, qualified as an expert appraiser of the property in issue, 600–02 South Ninth Street, Philadelphia, Pennsylvania ("the Property"); Anthony Battaglia, an active South Street realtor who acquired the Debtor's proposed tenant, the Billiard Club of Philadelphia, Inc. ("Billiards"); and Philip B. Longo, Billiards' principal. The first mortgagee of the Property, Fay Goodman ("the Mortgagee"), called Charles Kahn, Jr., as her expert appraiser; and her nephew, Bruce A. Goodman, who is a broker and manager of the affairs of the Mortgagee. (All witnesses

are referred to hereafter by their surnames.)

The Debtor purchased the Property from the Mortgagee on December 23, 1987, for $750,000. $525,000 of this sum was financed by a loan secured by a purchase-money mortgage in favor of the Mortgagee. The interest rate of the mortgage loan was two (2%) percent over prime and it featured a two-year balloon. The Debtor did not make all of the interest payments, nor the balloon payment. The Mortgagee's responsive foreclosure was halted by the instant bankruptcy filing. Also encumbering the Property is a second mortgage of $150,000, and a third mortgage held by insiders of $225,000. Both of the junior mortgagees supported the Motion.

At the time of purchase, the Property, a large three-story building, was in poor condition. Initially, the Debtor planned to renovate the building for commercial use on the first floor and residential use on the second and third floors, but it failed to obtain the requisite financing to do so.

On August 22, 1990, the Debtor entered into a ten (10) year lease for the entire Property ("the Lease") with Billiards, whose ownership presently owns a large successful "upscale" billiards parlor in Manhattan and new, smaller, and less successful establishments in Long Island and Atlanta, Georgia. The Philadelphia operation would be large, on the scale of the Manhattan operation, but would be operated, unlike the Manhattan site, as a private club.

The Lease requires the Debtor to renovate the Property to enable it to provide Billiards with a "vanilla shell," which it estimates would take two months after the proposed loan was funded to accomplish. Billiards would then take possession of the Property and perform additional renovations estimated at $200,000 to adapt the Property to its own needs.

The Lease requires Billiards to pay rent of $125,000 annually in the first year, with increases in rent of five (5%) percent each year thereafter. It is a "triple-net" lease, i.e., it requires that the tenant pay all costs related to the Property except maintenance of the roof and walls. The Debtor agreed to allow Billiards to pay only half of the rent due in the first two months, and to make up the shortfall later in the first year of the Lease. The last tenant of the Property, a portion of a medical facility, paid rent to the Mortgagee of only $66,000 per year.

Steerman testified that the Debtor has expended in excess of $100,000 on improving the Property, but that an additional $162,000, the proceeds of loan, are needed to complete the renovations necessary for the Property to attain the requisite "vanilla shell" state. Steerman also testified that the Debtor has negotiated the dismissal of an appeal, by several dissident community groups, of the Debtor's successful request for a zoning variance, which would allow Billiards to use the Property as a billiards parlor.

The loan in issue was to be made from four non-insider individuals, Louis Silverman, Celia Silverman, Leon Silverman, and Elias Stein ("the Lenders"), the latter of whom testified at trial. Steerman testified that the Debtor approached the first and second mortgagees and about 13 other sources, including banks and individuals, for financing before agreeing to the instant loan terms. Steerman also stated that none of these sources would make the requisite loan to the Debtor unless it was initially agreed that the lender receive a first lien on the Property, and all but the Lenders would not provide credit under even those conditions. The loan provides for interest at five (5%) percent above prime and a five-year repayment schedule.

The Plan proposes full payment to all creditors within five years. However, payments of interest only are contemplated to all of the mortgagees pending refinancing or sale of the Property. The Mortgagee is to be paid mostly interest, in an amount of at least $52,000 in the first year and amounts increasing to at least about $79,000 in the fifth year.

Levin, a well-qualified appraiser, valued the Property at present at $750,000 without the Lease and $1,000,000 with the Lease. The former figure was derived from testi-

mony that depreciation of the Property of five to ten percent since its purchase was offset by enhancement of the Property by the renovations already completed. The latter figure was based on a capitalization approach, applying a twelve (12%) percent capitalization rate to the gross rentals payable under the Lease.

Battaglia, whose firm, Plumer and Levit, was purportedly involved in ninety (90%) percent of the transactions involving South Street realty over the past three years, supported Levin's current valuation testimony with the terms of a recent sale of a building of comparable size, and in only slightly better condition, situated at a somewhat less favorable location at Broad and South Streets, for $875,000. Given the extended period that a tenant had been sought for the Property, Battaglia testified that the rent terms were "good" for the Debtor.

Kahn presented impeccable qualifications as a broker and appraiser, but his only experiences in South Street property were with the sale of the instant Property to the Debtor in 1987 and the recent sale of the aforesaid building at Broad and South Streets. Initially, he disagreed with Levin's assessment that the percentage of market slippage since the December, 1987, sale was five to ten percent, pegging the figure at 15 to 20 percent. Based upon this conclusion, he opined that the value of the property, without the Lease in place, could be as low as $575,000.

In measuring the value of the Property with the Lease in place, while stating that he agreed with much of what Levin and Battaglia had said, Kahn contended that three sorts of adjustments to the capitalization-rate calculations of Levin were appropriate: (1) Deduction of six (6%) percent management costs, five (5%) percent repair costs, and a five (5%) percent vacancy rate allowance from the gross rentals; (2) Application of a fourteen (14%) percent capitalization rate rather than twelve (12%) percent, due solely to the alleged financial insecurity of Billiards as tenant; and (3) Consideration of the fact that refinancing of only about sixty-seven (67%) percent of

the value of the Property was feasible. The first two adjustments purportedly left the value of the Property at $735,000, less than the sum of the Mortgagee's debt ($687,000) and the new debt ($162,000), or $849,000. However, we note that Kahn was unable to mathematically support his calculations in the face of cross-examination and that, in fact, the mathematical result of his first two adjustments appear to be as follows:

$1,250,000 (even without considering the five (5%) percent per annum increase)

$$\times \quad .16$$
$$\overline{\phantom{0}200,000}$$

$1,250,000 − $200,000 = $1,050,000

$$\begin{array}{r} \$1,050,000 \\ \times \quad .86 \\ \hline \$\ 903,000 \end{array}$$

## C. APPLICABLE LEGAL PRINCIPLES

The Code section under which the Motion arises is 11 U.S.C. § 364(d), which provides as follows:

(d)(1) The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if—

(A) the trustee is unable to obtain such credit otherwise; and

(B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

(2) In any hearing under this subsection, the trustee has the burden of proof on the issue of adequate protection.

Section 364(d)(1)(A) seemingly requires only a showing that the Debtor has attempted unsuccessfully to obtain credit on better terms from other sources. However, in *Crouse Group, supra*, considering 11 U.S.C. § 364(c), which on its face requires only the showing mandated by § 364(d)(1)(A), we held that debtor(s) must show the following to succeed in a motion under § 364(c):

(1) They are unable to obtain unsecured credit per 11 U.S.C. § 364(b), *i.e.*, by al-

lowing a lender only an administrative claim per 11 U.S.C. § 503(b)(1)(A); (2) The credit transaction is necessary to preserve the assets of the estate; and (3) The terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender.

*See also In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 37–40 (Bankr.S.D.N.Y.1990); and *In re St. Mary Hospital*, 86 B.R. 393, 401–02 (Bankr.E.D.Pa.1988).

■ We had several reasons for formulating this three-pronged test. Obtaining credit should be permitted not only because it is not available elsewhere, which could suggest the unsoundness of the basis for use of the funds generated by credit, but also because the credit acquired is of significant benefit to the debtor's estate and that the terms of the proposed loan are within the bounds of reason, irrespective of the inability of the debtor to obtain comparable credit elsewhere. As the decisions in *Crouse Group* and *St. Mary* indicate, respectively, credit should not be approved when it is sought for the primary benefit of a party other than the debtor or when funds are readily available from insiders or others without providing the lender with the benefits of any priority.

■ These decisions suggest that it is important for a bankruptcy court to make a qualitative assessment of the credit transaction in light of readily-available alternatives before granting *any* § 364 motion. Since such a qualitative analysis is necessary in considering every § 364 motion, it should not be neglected in deciding whether to grant a § 364(d) motion.

■ Section 363(d)(1)(B) requires the movant to prove that the lender who is subject to being primed will be adequately protected in the face of the loan transaction. We note that many courts appear to decide the issue of adequate protection, particularly in this context, solely by attempting to determine whether the lender subject to priming will be left with an equity cushion. *Compare In re Snowshoe Co.*, 789 F.2d 1085, 1088–90 (4th Cir.1986); *Anchor Savings Bank FSB v. Sky Valley,*

*Inc.*, 99 B.R. 117, 123 (N.D.Ga.1989); and *In re Dunes Casino, Hotel*, 69 B.R. 784, 795–96 (Bankr.D.N.J.1986) (equity cushion found; § 364(d)(1)(B) satisfied), *with In re Phoenix Steel Corp.*, 39 B.R. 218, 224–233 (D.Del.1984); *In re Tenney Village Co.*, 104 B.R. 562, 565–67 (Bankr.D.N.H.1989); and *In re Reading Tube Industries, Inc.*, 72 B.R. 329, 333–34 (Bankr.E.D.Pa.1987) (no equity cushion found; § 364(d)(1)(B) not satisfied).

An equity cushion analysis contains certain inherent pitfalls. It must first be determined whether "going concern" or "liquidated" valuation is in issue. *See Phoenix Steel*, 39 B.R. at 227–29; and *Tenney Village*, 104 B.R. at 564–67. Then, a determination highly dependent on the forensic skills of "dueling appraisers" must be made. Conceptually, making such an analysis determinative may permit a debtor who can establish an equity cushion to foolishly "let the air out" of an equity cushion, while, on the other hand, it may direct the denial of permission to a debtor who lacks an equity cushion to enter into a transaction which is demonstrably wise and resourceful.

Therefore, we believe that, while the presence of an equity cushion should be a relevant factor, it should not be a determinative factor in any "adequate protection" analysis, and particularly one relating to § 364(d)(1)(B). The important question, in determination of whether the protection to a creditor's secured interest is adequate, is whether that interest, whatever it is, is being unjustifiably jeopardized. *See In re Grant Broadcasting of Philadelphia, Inc.*, 71 B.R. 376, 386–89 (Bankr.E.D.Pa.), *aff'd*, 75 B.R. 819 (E.D.Pa.1987); and *In re Alyucan Interstate Corp.*, 12 B.R. 803, 809–12 (Bankr.D.Utah 1981). Consequently, in *Grant Broadcasting* and our later decisions, such as *Franklin Pembroke, supra*, 105 B.R. at 278, we have stated that:

we have adopted a holistic approach, ... the issue of adequate protection, ... is measured by

"an analysis of all of the relevant facts, with a particular focus upon the value of the collateral, the likelihood

that it will depreciate or appreciate over time, the prospects for successful reorganization of the Debtor's affairs by means of the Plan, and the Debtor's performance in accordance with the Plan."

[*In re TM*] *Carlton House* [*Partners, Ltd.,*], 91 B.R. [349,] at 357 [Bankr.E.D. Pa.1988] (quoting *in re Tashjian*, 72 B.R. 968, 973 (Bankr.E.D.Pa.1987)). *See also* [*In re 1606 New Hampshire Ave. Associates* ], 85 B.R. [298,] at 309 [Bankr. E.D.Pa.1988]; [*In re* ] *Cann & Saul* [*Steel Co.,*] *supra,* 76 B.R. [479,] at 485 [Bankr.E.D.Pa.1987]; and *Grant Broadcasting,* 71 B.R. at 388–89.

We believe that such a "holistic approach" is particularly pertinent to consideration of a § 364(d) motion, where the potential of the advance of credit to allow the formulation of a successful plan and thereby benefit the debtor's estate, and the interests of all of its creditors, including secured creditors which it attempts to prime, is at issue.

### D. APPLICATION OF LEGAL PRINCIPLES TO THE FACTS AT HAND

■ We shall now apply our formulation of the above-mentioned criteria for measuring the acceptability of a § 364(d) motion generally to the record made on the instant Motion. As the Mortgagee appears to concede, the Debtor has made a considerable search for credit on more favorable terms. However, Goodman stated that his aunt was willing to loan $50,000 to the Debtor under the same terms as the present loan from the Mortgagee, *i.e.,* at two (2%) percent over prime. The instant loan would, of course, feature interest payments at the rate of five (5%) percent over prime, which is significantly higher than the rate of the Mortgagee's loan and is, in our opinion, a high rate of interest generally. We observe that the ideal, given these loan possibilities, would have been for the Debtor to have borrowed $50,000 or any significant amount available from the Mortgagee on her quoted terms and only $102,000 or the balance of the $162,000 from the proposed new lenders on their terms. It may be that the Mortgagee would not agree to loan even $50,000 if any loan to prime its loan is

also made. However, the possibility of the Debtor's obtaining a $50,000 loan or an even larger loan from the Mortgagee at a lower rate of interest than five (5%) percent over prime appears to exist.

It is our belief that the possibility of negotiating such a loan package should be explored and ruled out before the loan for $162,000 from the current lenders is consummated. Otherwise, the Debtor would be unable to meet the requirement that the loan terms are adequate, given the Debtor's particular circumstances and full exhaustion of more attractive alternative prospects.

■ However, except in this one area, we believe that the Debtor's evidence of a credit quest has been adequate to establish that some degree of priming of a loan is necessary if the borrowing in issue is to be accomplished. We are also convinced that, without the loan, the Debtor could not go forward with its plan to rent the Property to Billiards under the Lease. We would have hoped that the Debtor could have acquired credit cheaper than at the high rate of interest which this loan demands. However, we acknowledge that credit is tight. The effect of the high rate of interest is diminished by the Debtor's expressed intention to repay it promptly. We can easily distinguish the importance of this loan to the Debtor's estate from the loan at issue in *Crouse Group,* 71 B.R. at 550–51, which largely benefitted the lender. The terms do not give the Lenders the over-all control of the Debtor's activities which the court found unacceptable in *Tenney Village, supra,* 104 B.R. at 567–70.

We can therefore pass to consideration of whether the Mortgagee's interests are adequately protected by the terms of the proposed loan, under § 364(d)(1)(B). To the extent that it is significant, it does appear that the Mortgagee can rest assured of at least a modest equity cushion. We agree with the reasoning of *Sky Valley, supra,* 99 B.R. at 122, that, to the extent that the presence of an equity cushion is significant, we need only consider the equity status of the objecting creditor, rather than the Debtor's equity in the property generally.

This analysis contrasts with an evaluation under 11 U.S.C. § 362(d)(2)(A), where a debtor's equity in the property in relation to all secured claims is measured.

The sum of the Mortgagee's loan balance and the new loan are about $850,000. The range of the value of the Property at present, without considering the Lease, is between $575,000 and $750,000. With the Lease in place, the testimony in the record supports the conclusion that the range of value is between $903,000 [1] and $1,000,000. Therefore, the Mortgagee does in fact have an equity cushion. However, this cushion is small enough that, when the accumulation of interest from the delays for completing the renovations and for Billiards to begin making payments and the costs of foreclosure are considered, this cushion is probably doomed to be quickly exhausted in the event of the failure of Billiards' venture.

The really important questions to be answered are as follows: (1) Is the Debtor's Plan, featuring the Lease to Billiards, feasible? and (2) Is the consummation of the loan likely to increase the value of the Debtor's estate and thereby enhance the value of the Mortgagee's security?

Regarding the first question, we consider the Plan to be potentially feasible. It does not feature reliance on manipulation of different valuations of the Debtor's assets in different contexts, like the plan at issue in *In re Ajax/Acorn Mfg., Inc.,* Bankr. No. 88–13965F, slip op. at 13–16 (Bankr.E.D.Pa. July 20, 1990). Nor does it rely upon projections which the courts reviewing same were compelled to find were totally unrealistic, like those posited by the debtors in *Ajax/Acorn, supra,* slip op. at 9–11; *In re Timber Products, Inc.,* 1990 WL 66370, 1990 Bankr. LEXIS 1171, slip op. at 12–16 (Bankr.W.D.Pa. May 17, 1990); *Reading Tube, supra,* 72 B.R. at 333–34; and *In re St. Petersburg Hotel Associates, Ltd.,* 44 B.R. 944, 946 (Bankr.M.D.Fla.1984).

Considering that the rental to be paid by Billiards under the Lease is almost double that paid by the prior tenant of the Proper-ty, we agree with Battaglia's assessment that the terms of the Lease are "good" for the Debtor. The only apparent significant contingency is the financial health of Billiards. As Goodman acknowledged, the concept of Billiards' operation of an "upscale" billiards parlor in the booming, trendy South Street environment, appears sound. We were favorably impressed with Longo's candor and commitment to this enterprise. Despite Goodman's contention that it was impractical for the Debtor to allow Billiards to fit out the Property in a manner which might be incompatible with other uses if Billiards failed, we find the evidence that Billiards will not fail to be sufficiently encouraging and the Lease to be sufficiently favorable to allow this proposed enterprise to take shape. The Debtor's exercise of its business judgment to move in the direction of renting to Billiards, given Battaglia's testimony that attempts to secure more conventional tenants for the Property were attempted and failed, was not unreasonable. *See In re Simasko Production Co.,* 47 B.R. 444, 449 (D.Colo.1985).

▮ Although the Mortgagee may object to its treatment under the Plan, the Plan may nevertheless be confirmable, at least with adjustments which might spur a consensus. A confirmed plan, by definition, provides adequate protection to all objecting creditors. *See In re Stanley Hotel, Inc.,* 15 B.R. 660, 664 (D.Colo.1981).

The issue of whether the loan will enhance the value of the Debtor's sole asset, *i.e.,* the Property, rather clearly tips in the Debtor's favor. The loan investment of $162,000 will result in an enhancement to the Property of between $250,000 (using Levin's figures of $750,000 without the Lease and $1,000,000 with it) and $328,000 (using Kahn's figures of $575,000 without the Lease and $903,000 with it). *Compare Snowshoe, supra* (loan of $1.5 to $2 million would result in prevention of loss of fifty (50%) percent to ninety (90%) percent of business worth in excess of $19 million; loan approved), *with In re First South*

---

1. As our calculations at page 195 indicate, we do not believe that Kahn's testimony supports his valuation of $735,000, but, rather, supports the $903,000 figure.

*Savings Ass'n,* 820 F.2d 700, 710–15 (5th Cir.1987) (loan of $2 million would enhance value of property by only $1 million; denial of motion for a stay pending an appeal of an order granting a § 364(d) motion reversed).

We therefore conclude, with the caveat that the Debtor must first exhaust the possibility of obtaining part of the credit needed from the Mortgagee, that the Motion should be granted. An Order so providing, and granting the Debtor's Application to extend the time for filing the D/S after a final Order in reference to the Motion is entered, will follow.

### ORDER

AND NOW, this 17th day of January, 1991, after a hearing of January 2, 1991, on the Debtor's Motion to Incur Secured Debt ("the Motion"), and upon consideration of the parties' post-trial submissions, it is hereby ORDERED as follows:

1. The Debtor shall forthwith attempt to negotiate with its present first mortgagee, FAY GOODMAN ("the Mortgagee") to determine whether Goodman will loan it some or all of the $162,000 which it desires to borrow from Louis Silverman, Celia Silverman, Leon Silverman, and Elias Stein, and shall file a Report on its progress in this regard on or before January 25, 1991.

2. The Mortgagee or any interested party may comment upon this Report within four business days from the filing of the Debtor's Report, in no event later than January 31, 1991.

3. The original copy of the materials described in paragraphs one and two above shall be filed with the Clerk of this Court and copies shall be served upon opposing counsel and delivered to the Court on or before 4:30 P.M. on the respective dates indicated at the following address:

The Honorable David A. Scholl
United States Bankruptcy Judge
3722 United States Court House
601 Market Street
Philadelphia, PA 19106–1763

4. Since the court does not intend to enter any final Order on the Motion until after receipt of the above submissions, which may be as late as January 31, 1991, the Debtor's Application to extend the deadlines set forth in our Order of December 14, 1990, for the filing of a Disclosure Statement and a hearing thereon is GRANTED. The Debtor shall file a proposed Disclosure Statement and any Amended Plan of Reorganization and notify all interested parties of same on or before February 15, 1991. A hearing on the Disclosure Statement is to be scheduled no later than on

WEDNESDAY, MARCH 13, 1991, at 9:30 A.M. and shall be held in Courtroom No. 2 (Room 3718), United States Court House, 601 Market Street, Philadelphia, PA 19106.