**In re STRUG–DIVISION LLC, Debtor.**

**Strug–Lawrence LLC, Debtor**

**Boan LLC, a Limited Liability Company, Debtor**

**910 West Lawrence LLC, a Limited Liability Company, Debtor.**

**Nos. 07 B 15933, 07 B 15935, 07 B 15937, 07 B 15938.**

United States Bankruptcy Court, N.D. Illinois, Eastern Division.

Jan. 14, 2008.

Jeffrey Strange, Esq., Jeffrey Strange and Associates, Wilmette, IL, for Debtors.

David D. Ferguson, Esq., Aaron C. Jackson, Esq., Polsinelli Shalton Flanigan Suelthaus PC, Kansas City, MO, for Natixis Real Estate Capital, Inc.

Arnold G. Kaplan, Esq., Law Offices of Arnold Kaplan Ltd., Chicago, IL, for Debtors.

Carina M.C. Segalini, Esq., Polsinelli Shalton Flanigan Suelthaus PC, Chicago, IL, for Natixis Real Estate Capital, Inc.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW ON MOTION TO MODIFY STAY

JACK B. SCHMETTERER,
Bankruptcy Judge.

These jointly administered cases were filed by related Debtors under Chapter 11 of the Bankruptcy Code. Previously, Strug–Division LLC and Strug–Lawrence LLC filed jointly administered Chapter 11 cases which were dismissed for lack of good faith. *In re Strug–Division LLC,* 375 B.R. 445 (Bankr.N.D.Ill.2007) ("Strug I").

It was found in Strug I that the proposed Plan was neither legally possible (because a possible sale could not proceed over objection of the secured creditor) nor feasible (because income generated by the retained property would be insufficient to service the balance of the loan even if a sale were possible). Moreover, neither of the Debtors owned the real estate to be dealt with by the Plan. *See Strug I,* 375 B.R. at 449–50.

After the decision in Strug I dismissed the earlier cases, the current cases were filed ("Strug II"). This time two more related entities were joined because they own the real estate in question, Boan LLC and 910 West Lawrence LLC.

The secured creditor Natixis ("Natixis") promptly filed its Motion for Relief from Automatic Stay, or alternatively for Dismissal or Appointment of a Chapter 11 Trustee. Consolidated evidence hearing was set on all those motions. Due to the time constraints for deciding a motion to modify stay under 11 U.S.C. § 362, the Motion to Modify Stay was brought to a close first. The parties rested on that issue. Following final argument on that Motion and for reasons stated below, the automatic bankruptcy stay under 11 U.S.C. § 362 was modified to permit Natixis to pursue its right and remedies under the loan documents to foreclose liens on the assets of Debtors and otherwise realize on its collateral.

One insurmountable problem faced by Debtors in these cases was their asserted need to prime the Natixis loans by borrowing a large sum to repair extensive damage and upgrade the properties. They claimed a need to borrow from one or more lenders who would loan only if granted first liens. It is held here under 11 U.S.C. § 364(d)(1) that approval of any loan that would prime Natixis would be denied because Debtors cannot adequately

protect Natixis as required by that provision.

However, when the order granting Motion to Modify Stay was presented on November 30, 2007, Debtors then showed that they had some possibility of obtaining one or more loans from parties that would accept secondary liens. Therefore the effect of Order for Relief From Stay entered that day was stayed to December 17, 2007, to permit the parties to see whether such loans would actually become available so as to benefit the properties without impairing the Natixis liens. The remaining Motions to Dismiss or for Appointment of Chapter 11 Trustee were continued for status and possible further hearing.

The following will constitute Findings of Fact and Conclusions of Law upon which the Order modifying stay was earlier entered.

### FINDINGS OF FACT

#### Findings from Joint Stipulation and Undisputed Facts

1. Debtor Strug–Division owns the sole membership interest in Boan LLC ("Boan"). That membership interest is Strug–Division's only asset. Strug–Division's sole creditor is Natixis.

2. Debtor Strug–Lawrence owns the sole membership interest in 910 West Lawrence LLC ("West Lawrence LLC"). That membership interest is Strug–Lawrence's only asset. Strug–Lawrence's sole creditor is Natixis.

3. Strug–Division and Strug–Lawrence ("Debtors") together borrowed $1,100,000 from Natixis, securing the loan with a lien on their membership interests in Boan LLC and 910 West Lawrence LLC.

4. After Strug–Division and Strug–Lawrence defaulted on the loan to Strug–Division and Strug–Lawrence, Natixis commenced efforts to foreclose its lien on their membership interests in Boan LLC and 910 West Lawrence LLC. Strug–Division and Strug–Lawrence filed their Chapter 11 cases two days before the scheduled foreclosure sale.

5. Strug–Division owns no personal property other than its membership interest in Boan LLC, and it owns no real property. Strug–Division's Schedules reflect no contracts with employees or prepetition claims of employees. Strug–Division has no creditors, secured or unsecured, other than Natixis. Strug–Division conducts no business operations, and exists solely to act own [sic] the membership interest in Boan LLC.

6. Strug–Lawrence owns no personal property other than its membership interest in 910 West Lawrence LLC, and it owns no real property. Strug–Lawrence's Schedules reflect no contracts with employees or prepetition claims of employees. Strug–Lawrence has no creditors, secured or unsecured, other than Natixis. Strug–Lawrence conducts no business operations, and exists solely to own the membership interest in West Lawrence LLC.

7. Strug–Division, Strug–Lawrence, Boan LLC and 910 West Lawrence LLC entered into loan transactions with Natixis in August of 2006. All membership interests in Strug–Division and Strug–Lawrence are owned by Dragoljub Giljen, a.k.a., Daniel Giljen ("Giljen"). Giljen is the sole member in Strug–Division and Strug–Lawrence.

8. Strug–Division owns the sole membership interest in Boan LLC. Boan LLC's sole asset is an apartment complex located at 11 West Division Street, Chicago, Illinois, commonly known as the Gold Coast Suites.

9. Strug–Lawrence owns the sole membership interest in 910 West Lawrence LLC. 910 West Lawrence LLC's sole asset is an apartment complex located at 910 West Lawrence Avenue, Chicago, Illinois, commonly known as the Lakeside Tower.

10. Natixis' Exhibit 8 is a chart reflecting the relationships among these entities.

11. In late August of 2006, Boan LLC and 910 West Lawrence LLC (sometimes referred to as the "Senior Borrowers") together entered into a Loan Agreement (the "Senior Loan Agreement") under which they borrowed $14,650,000 from Natixis. Natixis' Exhibit 1 is a copy of the Senior Loan Agreement.

12. The loan to Boan LLC and West Lawrence LLC (the "Senior Loan") is further evidenced by a promissory note (the "Senior Note"), and is secured by a mortgage (the "Senior Mortgage"). Pursuant to the Senior Mortgage, Natixis holds a lien on the apartment properties of the Senior Borrowers. Natixis' Exhibit 3 is a copy of the Senior Mortgage.

13. To further secure the Senior Loan, Giljen executed a written guaranty in favor of Natixis. That guaranty, along with the Senior Note, the Senior Loan Agreement, and the other the other documents executed in connection with the Senior Loan, are sometimes referred to in this opinion collectively as the "Senior Loan Documents."

14. At the same time that Natixis made the Senior Loan to the Senior Borrowers, Natixis loaned $1,100,000 to Strug–Division and to Strug–Lawrence LLC (referred to in Finding No. 3). Strug–Division and Strug–Lawrence executed a Loan Agreement (the "Mezzanine Loan Agreement") and a promissory note (the "Mezzanine Note") to evidence the loan (the "Mezzanine Loan"). Natixis' Exhibit 4 is a copy of the Mezzanine Loan Agreement.

15. To secure the Mezzanine Loan, Strug–Division granted to Natixis a security interest in Strug–Division's only asset-Strug-Division's membership interest in Boan LLC.

16. Strug–Lawrence did likewise, granting to Natixis a security interest in Strug–Lawrence's only asset-Strug-Lawrence's membership interest in 910 West Lawrence LLC.

17. To further secure the Mezzanine Loan, Giljen signed a written guaranty in favor of Natixis. That guaranty, along with the Mezzanine Note, the Mezzanine Loan Agreement, and the other documents executed in connection with the Mezzanine Loan, are referred to collectively as the "Mezzanine Loan Documents."

18. The Senior Borrowers made only the initial payment on the Senior Loan and have failed to make any payments since.

19. In early March of 2007, Natixis accelerated the debt due under the Senior Loan Documents. On March 19, 2007, Natixis filed a complaint to foreclose its liens on the Senior Borrowers' apartment properties.

20. As with the Senior Loan, Strug–Division and Strug–Lawrence made only the initial payment due on the Mezzanine Loan, and have made no payments since. After the default on the Mezzanine Loan, Natixis accelerated the debt due under the Mezzanine Loan Documents.

21. On May 8, 2007, Natixis gave notice to the Mezzanine Borrowers that the equity interests in Boan LLC and 910 West Lawrence LLC were to be sold pursuant to the provisions of the Uniform Commercial Code. May 21, 2007 was set as the sale date. The Mezzanine Borrowers filed Chapter 11 petitions on May 19, 2007, two days before the scheduled foreclosure sale.

22. The Senior Borrowers and the Mezzanine Borrowers only made one loan payment on each of the loans since the inception of the loans.

23. Boan LLC's apartment property, the Gold Coast Suites, was valued at $14,300,000 under an appraisal by a Natixis expert dated July 7, 2006. Natixis' Exhibit 35 is a copy of that appraisal.

24. Section 4.21 of the Mezzanine Loan Agreement states:

Other Debt. There is no indebtedness with respect to the Property or any excess cash flow or any residual interest therein, whether secured or unsecured, other than Permitted Indebtedness as defined in the Senior Loan Agreement.

The Senior Loan Agreement, at § 4.21, contains a similar provision.

25. The Senior Loan Agreement defines "Permitted Indebtedness" as follows:

Permitted Indebtedness: the Debt[1] and unsecured trade payables incurred in the ordinary course of business relating to the ownership and operation of the Property which do not exceed, at any time, a maximum amount of one percent (1%) of the original amount of the Principal and are paid within thirty (30) days of the date incurred, and the Mezzanine Debt.

26. Section 4.21 of the Senior Loan Agreement states:

*Other Debt.* There is no indebtedness with respect to the Property or any indebtedness secured over excess cash flow or any residual interest therein, whether secured or unsecured, other than Permitted Encumbrances and Permitted Indebtedness.

27. "Permitted Encumbrances" refers primarily to the liens of Natixis and other liens disclosed in the public record. The Senior Loan Agreement defines "Permitted Encumbrances" as follows:

*Permitted Encumbrances:* (i) the Liens created by the Loan Documents, (ii) all Liens and other matters disclosed in the title insurance policy insuring the Lien of the Mortgage, (iii) Liens, if any, for Taxes or other charges not yet due and payable and not delinquent, (iv) any workers', mechanics' or other similar Liens on the Property provided that any such Lien is bonded or discharged within thirty (30) days after Borrower first receives notice of such Lien, and (v) such other title and survey exceptions as Lender approves in writing in Lender's discretion.

28. After Natixis made its loans to the Senior Borrowers and the Mezzanine Borrowers, two other lenders recorded mortgages against the Senior Borrowers' apartment complexes. Those mortgages secured loans made prior to the Natixis loans.

29. ALSJ, Inc. recorded a Mortgage on the real property of West Lawrence LLC. Debtors and West Lawrence LLC assert that the Mortgage was never granted to ALSJ, Inc. and that ALSJ, Inc. obtained the alleged lien by fraud. Natixis' Exhibit 22 is a copy of the Mortgage recorded by ALSJ, Inc.

30. There was a lien granted by Boan LLC other than the lien to Natixis. Boan LLC granted the lien on July 27, 2006 in favor of 1201 South Western LLC. The lien is evidenced by a Mortgage. Natixis Exhibit 23 is a copy of that Mortgage.

---

1. "Debt" in this document refers to the Senior Loan. *See* Senior Loan Agreement, § 2.1, and definition of "Debt" at § 1.1.1.

1201 South Western LLC recorded its Mortgage on November 16, 2006.

31. West Lawrence LLC granted a subordinate lien on its apartment property to CAA Finance LLC under a document titled "Loan Agreement, Mortgage, Assignment of Rents and Leases, Security Agreement and Fixture Financing Statement" (the "CAA Finance Mortgage"). Natixis' Exhibit 24 is copy of the CAA Finance Mortgage.

32. Giljen caused West Lawrence LLC to grant the CAA Finance Mortgage on September 20, 2006.

### Additional Findings from Trial Evidence Relevant to Stay Motion

33. Prior to the original bankruptcy filing ("Strug I"), an Illinois state court put the two subject properties into receivership. No request was made by any party during this or the prior bankruptcy to relieve the state court receiver. As testified by the Receiver, present income from rents is insufficient to pay proper maintenance and debt service. That is largely due to the fact that prior to the receivership, despite installation of a new boiler at the 11 West Division address, the heat was not adequately maintained, the pipes froze, and severe water damage resulted. Of the 110 units in the building, only 40 units are presently rentable and rented. No satisfactory explanation was given as to why that building was kept with heat so low that the pipes froze even after a new boiler had been installed. The inference to be drawn from that mishap is that Giljen did not select a good manager or building engineer, or did not supervise those persons, or both. That shocking lack of attention warrants the conclusion drawn here that Giljen is either not competent or is so distracted by his other enterprises that he did not give proper attention to this project. In any event, the flood resulting from frozen pipes devastated the building and rendered most of it unrentable. Consequently, the income for both buildings is far less than necessary to maintain or rehab the properties properly let alone pay debt service.

### Debtors' Plan

34. The Debtors own two buildings, located at 910 West Lawrence, Chicago, Illinois and 11 West Division, Chicago, Illinois. 910 West Lawrence contains 89 units of which 79 are currently occupied as of September 27, 2007 according to the most recent report of the Receiver. The monthly gross rent is $43,958. This does not include the antenna rental income from T–Mobile for $2,400 a month or the three commercial spaces for $2,500. If 910 West Lawrence was fully rented, the income would be $49,813 according to the Receiver.

The Debtors estimate that the rental income after repairs are completed and the building rented fully will be as follows:

| | |
|---|---:|
| 89 apartment units @ $650 each = | $57,850 |
| Commercial Space | 2,500 |
| T–Mobile Antenna | 2,400 |
| Total | $62,750 |

The 11 West Division building has 110 apartment units, two commercial spaces and two billboard spaces, one of which is rented. Approximately 40 of the apartments are rented. Sixty apartments need new carpet, painting and appliances to be rentable. The Debtors estimate that the cost per apartment will be approximately $7,000, for a total of $420,000.

The possible monthly market rent for apartments at 11 West Division is estimated to be $850 per unit. Once the building is renovated and fully rented, the income from the building is estimated by Debtors as follows (estimated at 100% of units to be rented):

| Projected Income | | |
| --- | --- | --- |
| 110 apartment units @ $850 each = | $ | 93,500 |
| Commercial space | | 18,600 |
| Billboard East Clear Channel | | 9,400 |
| Billboard West | | 9,400 |
| Total potential monthly income | $ | 130,900 |

| Projected Expenses | | |
| --- | --- | --- |
| Monthly mortgage payment including real estate taxes— | $ | 128,000 |
| Yearly Mortgage payment and taxes | | $1,536,000 |
| Gas | | 70,000 |
| Electric | | 30,000 |
| Maintenance | | 36,600 |
| Repairs | | 25,000 |
| Insurance | | 50,000 |
| | | $1,747,600 |

| | | |
| --- | --- | --- |
| Yearly projected potential income | | $2,323,800 |
| Less projected yearly expenses | | (1,747,600) |
| Net projected yearly cash flow | $ | 576,200 |

The Debtors' Plan seeks to finance the repairs and adequate protection payments from an infusion of new funds raised from a private investor to be granted a first lien position pursuant to 11 U.S.C. 364(d)(1). The Debtors argue that the current lender Natixis will be adequately protected, because the funds raised will be used to increase the value of the collateral.

### Value of Properties Compared to Debt

35. Debtors contend that rehab of the properties will result in value for exceeding debt, and that this "equity cushion" will protect Natixis even if its loans are primed. The facts are otherwise.

### A. Debt

According to the foreclosure judgment entered in the state court litigation, the debt on the Senior Loan at the time was $14,146,734.43 (Natixis Ex. 43). Statutory interest accrued thereafter at a rate of $4,828.57 per day, for a total of principle and interest amounting to $14,648,905.67 on that loan at the close of trial argument on November 27, 2007. The balance due on the Mezzanine Loan was $3,217,476.51 (Natixis Ex. 42). Therefore, the debt due under both loans secured by both properties at the end of trial on Motions to Modify Stay totaled $17,866,382.11. Daily interest continues to accrue. While Debt-

ors' counsel argued that a portion of the foreclosure judgment could be attacked, no such attack was made.

### B. Value

In connection with making the loans, in July, 2006, Natixis commissioned appraisals of the subject properties by the real estate management firm CB Richard Ellis ("CBRE"). The written reports of CBRE were marked as Natixis Exhibits 36 and 36, and entered into evidence in Strug I and the current hearing. Those appraisals valued the properties at:

| $ 7,000,000 | (910 West Lawrence) |
| --- | --- |
| $14,300,000 | (11 West Division) |
| Total: $21,300,000 | |

At the present hearing held in Strug II only a few months after the earlier trial, Natixis offered a new set of appraisals, this time by Dale Kleszynski of Associated Property Counselors, Ltd., who appraised the properties as follows:

| $ 6,000,000 | (910 West Lawrence) |
| --- | --- |
| $ 8,000,000 | (11 West Division) |
| Total: $14,000,000 | |

Natixis argued from the new appraisals that value of the properties had sharply dropped since the appraisals it offered in the first case. This is contrary to the weight of evidence which showed that the area where the subject properties are located in the "Gold Coast" area just north of the Chicago "Loop" is still a "hot" real estate market for similar properties, despite some softening of the real estate market relating to the nationwide "sub prime" loan problems and impairment of the real estate credit market.

Debtors' appraisal expert, Lawrence Starkman, testified that the valuation of real estate is not an exact science, and that the best appraisal can only provide a probability of value. The testimony of Mr. Starkman is found to be the most credible evidence of value in this case.

Apart from a solid background of expertise and experience that was not contested, his testimony was far more persuasive. While he did not do personal research, he relied on the CBRE appraisals commissioned by Natixis, which he praised as "textbook" in their quality and analysis. Based upon those opinions and coupled with his personal experience in the areas involved, he initially opined the following values:

| | |
|---|---|
| $ 7,000,000 | (910 West Lawrence) |
| $14,200,000 | (11 West Division) |
| Total: $21,200,000 | |

Those values assumed both a rehab of the properties and an optimum marketing effort, and were at the top of possible value. When asked what offers he would recommend to a would-be purchaser who hired him, he opined that high end of values he could suggest to offer would be:

| | |
|---|---|
| $ 6,300,000 | (910 West Lawrence) |
| $13,000,000 | (11 West Division) |
| Total: $19,300,000 | |

The latter values would take into account the uncertainties of real estate valuation and represent his best opinion of value. Those values are most credible, and both properties are therefore found to have a total value of $19,300,000 provided they are properly rehabbed. Rehab is estimated to cost between $1.3 and $2.0 million.

Thus upon comparing debt to value it is found that Debtors have no equity cushion to protect Natixis should a lender of monies needed to rehab the properties be allowed to lend between $1.3 and $2.0 million through a forced priming of Natixis liens. (Natixis' debt of about $17,900,000 plus loan of at least $1.3 million plus real estate taxes of $106,000 due December 3, 2007, would total $19,300,000, the same as total collateral value of $19,300,000.)

Other evidence of values offered by Debtors at trial came from persons experienced in commercial development in the area but who are connected to Debtors through Giljen or who are interested in participating in the venture through loans or otherwise and are thereby personally interested financially in Debtors' success. Therefore, their opinions that valued the properties far in excess of the Starkman estimates cannot be given great weight.

Facts set forth in the Conclusions of Law will stand as additional Findings of Fact.

## CONCLUSIONS OF LAW

### Discussion

■ Debtors presented much testimony about substantial value to be realized from an investment of from $1.3 to $2 million in 11 West Division, commonly known as the Gold Coast Suites. Mr. Trehan, a real estate speculator and consultant, provided a wildly optimistic projected value of $30 million after construction to be funded by a $2 million loan from Omega. (Debtors' Ex. 5b–1.) However, neither he or any other witness who testified said that they were ready to rely on their estimates of high value by taking a second mortgage on the property.

An "equity cushion" seems to be the preferred test of adequate protection required to prime a first mortgage under 11 U.S.C. § 364(d)(1). However, an opinion in *In re Aqua Assoc.*, 123 B.R. 192, 196–97 (Bankr.E.D.Pa.1991) adopted a "holistic" or flexible approach:

[W]e believe that, while the presence of an equity cushion should be a relevant factor, it should not be determinative factor in any "adequate protection" analysis, and particularly one relating to § 364(d)(1)(B). The important question, in determination of whether the protection to a creditor's secured interest is adequate, is whether that interest, whatever it is, is being unjustifiably jeopardized....

[T]he issue of adequate protection ... is measured by "an analysis of all the relevant facts, with a particular focus upon the value of the collateral, the likelihood that it will depreciate or appreciate over time, the prospects for successful reorganization of the Debtor's affairs by means of the Plan, and the Debtor's performance in accordance with the Plan."

This approach has sometimes been followed in other cases. *See In re 495 Cent. Park Ave. Corp.,* 136 B.R. 626 (Bankr. S.D.N.Y.1992).

■ An opinion dealing with facts analogous to those in this case was *In re Chevy Devco,* 78 B.R. 585 (Bankr.C.D.Cal.1987) (holding that the existing mortgagee would not be protected if it was primed by a new construction loan and superpriority lien because the potential success of the renovation project was too speculative). Adequate protection under § 364(d) requires that a first secured creditor be given protection equivalent to that which it would receive if it were voluntarily making a mixed secured and unsecured loan in a junior position. *Id.* at 588.

As of the end of trial, there was found a total of almost $17,900,000 due on Natixis' loan. An additional $106,000 in real estate taxes was to become due by December 3, 2007. The two properties are not generating sufficient income to pay those taxes, and Debtors' principal has not come forward to satisfy that obligation with personal funds. Furthermore, an additional $144,857.09 of interest accrues every month should there be any small equity.

Debtor's expert, Mr. Starkman, testified to the "textbook" quality of the CB Richard Ellis appraisals obtained by Natixis in June 2006, and he believes that they accurately reflect the value of the two properties as of today. Those appraisals valued 11 West Division at $14.3 million and 910 West Lawrence at $7 million. Upon questioning, Mr. Starkman acknowledged that to be safe he would counsel a hypothetical buyer who might hired him to give advice on these properties to offer between $12.8 and $13 million for 11 West Division, and $6 to $6.3 million for 910 West Lawrence. He agreed that even the best appraisal can only give probability of value. Based on his testimony, it is found that there is a spread of possible value of between $18.8 and $23.3 million in total for the two properties.

If there is any equity cushion in the properties, it is eroding on a daily basis. Debtors are trying to reorganize on a shoe-string budget, and the potential success of the proposed renovation project is too speculative. The state court Receiver's Maintenance Supervisor, Donald Golec, testified that it will take 12 to 18 months to complete the renovations at 11 West Division. It is unclear from the evidence how much is needed for actual improvements, and part of any loan will be needed to service the various debts during construction. With nonexistent, or at most a small and eroding equity cushion, Natixis should not be required to bear the risk of whether the renovations will generate income necessary to service its loan and the new loan, or whether the ultimate increased value will protect its loans if subordinated.

### Debtor Cannot Prime the Natixis Debt

■ Under 11 U.S.C. § 364(d)(1), if the debtor in possession is unable to obtain unsecured or junior loans, it may be allowed to borrowed a loan to prime existing debt only if "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted." The Debtors have burden of proof on the issue of adequate protection

pursuant to § 364(d)(2). "Adequate protection" is defined in 11 U.S.C. § 361 (in terms applicable to §§ 362 and 364) and requires (1) periodic cash payments, (2) an additional or replacement lien, or (3) other relief that will result in realization of the "indubitable equivalent" of the creditor's lien interest.

The only adequate protection offered by Debtors for the proposed subordination of the Natixis liens is the increase in property value resulting from the rehab work. However, as shown above, such increase in value will not bring total value to much more than the debt plus proposed loan. The "equity cushion" would be small, and therefore the risk of being primed would be entirely on Natixis. Debtors cannot thereby provide the "indubitable equivalent" of the Natixis present interests, and therefore cannot provide adequate protection. Consequently, Debtors cannot qualify to obtain a loan with a priming lien under § 364(d)(1). Since no other type of funding has been offered, Debtors lack the resources to rehab the property, and its proposed Plan is thereby shown to be unfundable and unconfirmable.

### Standards for Stay Modification under 11 D.S.C. § 362

Pursuant to 11 U.S.C. § 362(d)(1), relief from stay "shall" be granted "for cause, including lack of adequate protection of an interest in property of said party in interest."

Debtors have the burden of proving adequate protection of the creditor in order to preserve the stay. § 362(g).

This issue requires in the present case a determination of the legal and economic feasibility of Debtors' proposed Plan. At this early stage in the case, Chapter 11 debtors are usually entitled to some latitude in presenting contemplated or proposed plans. *See United Savings Assoc. v.* *Timbers of Inwood Forest,* 484 U.S. 365, 376, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988). However, here the key to Debtors' proposed Plan is their asserted need to prime the Natixis loans. Since they cannot do so under § 364(d)(*l*), and no other committed financing has been shown to be available, Debtors have not met their burden to show adequate protection under 11 U.S.C. § 362(d)(1). This is so because the properties are in need of substantial repairs to improve them and the capital to pay for repairs is not available. The property values after repairs would only be slightly more than the debt, and the whole project would depend on work performed at great speed under doubtful direction by Mr. Giljen who lacks a good management track record.

Therefore, the stay was modified.